# EXHIBIT H

**IN THE COURT OF APPEAL OF THE REPUBLIC OF SINGAPORE**

**[2024] SGCA 9**

Civil Appeal No 10 of 2023

Between

Gonzalo Gil White

… *Appellant*

And

(1)    Oro Negro Drilling Pte Ltd
(2)    Oro Negro Decus Pte Ltd
(3)    Oro Negro Fortius Pte Ltd
(4)    Oro Negro Impetus Pte Ltd
(5)    Oro Negro Laurus Pte Ltd
(6)    Oro Negro Primus Pte Ltd

… *Respondents*

In the matter of Originating Summons No 126 of 2018

Between

(1)    Oro Negro Drilling Pte Ltd
(2)    Oro Negro Decus Pte Ltd
(3)    Oro Negro Fortius Pte Ltd
(4)    Oro Negro Impetus Pte Ltd
(5)    Oro Negro Laurus Pte Ltd
(6)    Oro Negro Primus Pte Ltd

… *Plaintiffs*

And

(1)    Integradora de Servicios Petroleros
        Oro Negro SAPI de CV
(2)    Alonso Del Val Echeverria
(3)    Gonzalo Gil White

… *Defendants*

# GROUNDS OF DECISION

[Civil Procedure — Injunctions — Prohibitory injunction to restrain breach of negative covenant]
[Companies — Memorandum and articles of association]
[Conflict of Laws — Restraint of foreign proceedings]

## TABLE OF CONTENTS

BACKGROUND FACTS ...........................................................................3

   THE PARTIES ..................................................................................3

   THE UNDERLYING DISPUTE ............................................................5

      *The bond agreement*................................................................5

      *The granting of powers of attorney to the Guerra Lawyers* .....................7

   PROCEDURAL HISTORY ....................................................................7

      *The filing of concurso petitions by the Guerra Lawyers*...........................7

      *The course of litigation in OS 126 before the Singapore courts*............. 10

      *The decisions of the Mexican courts in the Oro Concursos* ................... 12

      *The litigation before the Mexican courts in respect of
Integradora's and Perforadora's concursos* ........................................... 15

THE DECISION BELOW ...................................................................17

THE PARTIES' CASES ON APPEAL ...............................................21

   THE APPELLANT'S CASE ..............................................................21

   THE RESPONDENTS' CASE ............................................................22

ISSUES TO BE DETERMINED .........................................................23

OUR DECISION .................................................................................24

   THE COURT'S POWER TO ORDER A PERMANENT INJUNCTION .........................24

   THE TRUE NATURE OF THE RELIEF SOUGHT IN OS 126 ...................................28

   THERE WAS NO SCOPE FOR THE CONSIDERATION OF COMITY IN THE
PRESENT CASE ...............................................................................30

   THERE WAS NO IDENTITY OF ISSUES BETWEEN OS 126 AND THE ORO
CONCURSOS ...................................................................................39

*The requirement of identity of issues* ....................................................... *40*

*The significance of different laws in competing jurisdictions* ................ *41*

OBSERVATIONS ON THE REQUIREMENT OF IDENTITY OF PARTIES
WHERE INSOLVENCY PROCEEDINGS ARE INVOLVED ...................................... 49

THE PURPORTED FUTILITY OF RELIEF ........................................................... 55

**CONCLUSION** ................................................................................................**57**

> **This judgment is subject to final editorial corrections approved by the court and/or redaction pursuant to the publisher's duty in compliance with the law, for publication in LawNet and/or the Singapore Law Reports.**

# Gonzalo Gil White
### v
# Oro Negro Drilling Pte Ltd and others

**[2024] SGCA 9**

Court of Appeal — Civil Appeal No 10 of 2023
Sundaresh Menon CJ, Steven Chong JCA and Belinda Ang Saw Ean JCA
17 January 2024

22 March 2024

**Steven Chong JCA (delivering the grounds of decision of the court):**

1        To fully appreciate the key issues in this appeal, it is essential to track the history of the litigation before the courts in Singapore and in Mexico. The connection to Singapore stems from the fact that the respondents are all Singapore-incorporated companies. Each of the Singapore incorporated companies owns a single offshore jack-up drilling rig deployed in Mexican waters, giving rise to the Mexican nexus.

2        The heart of the dispute can be traced to a decision by the directors of the respondents to grant a power of attorney to several lawyers in a Mexican law firm to commence restructuring proceedings in Mexico in the name of the respondents ("the *Oro Concursos*"). However, the articles of association of the respondents (which we collectively refer to as "Art 115A" even though they bear a different number – "Art 111A" – in three of the respondents' constitutions) prohibits each of the respondent and its directors from initiating

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

the *Oro Concursos* without the affirmative vote of the respondents' independent director duly appointed by a bond trustee. However, no such vote was obtained. In fact, no notice was ever given to the independent director before the commencement of the *Oro Concursos*.

3       Given that the *Oro Concursos* were commenced in breach of Art 115A, it was hardly surprising that the respondents commenced this action in Singapore to restrain them. On 12 September 2019, this Court reinstated the interim injunctions against various parties including the appellant from "commencing, continuing or maintaining", *inter alia*, the *Oro Concursos*.

4       Notwithstanding the interim injunctions, it appeared that the *Oro Concursos* continued in Mexico in breach of this Court's order. It was under these circumstances that the appellant came before us to persuade this Court to deny the respondents the relief of the permanent injunction granted below on the principal ground that such an injunction would constitute, among other things, an abuse of process and would conflict with the decisions of the Mexican courts, citing judicial comity in aid thereof.

5       We heard and dismissed this appeal on 17 January 2024 with brief oral grounds. We found that there was no identity of issues between the Singapore proceedings in HC/OS 126/2018 ("OS 126") and the *Oro Concursos* to give rise to any abuse of process or *res judicata*. That in and of itself was dispositive of the appeal. It was also untenable for the appellant to rely on judicial comity to deny the respondents the permanent injunction on account of the various decisions of the Mexican courts. There was no dispute that the breach of Art 115A is continuing. Furthermore, the Mexican decisions were procured in breach of the interim injunctions earlier restored by this Court. To deny the permanent injunction would have been tantamount to not giving effect to the

2

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

previously ordered interim injunctions; this would in turn have effectively extended recognition to the Mexican decisions which were procured in breach of that interim injunction. In short, judicial comity could not be applied at the expense of the court's role to protect its own jurisdiction and orders.

**Background facts**

6       The facts for the underlying dispute are extensive and have been traversed in the decision below in *Oro Negro Drilling Pte Ltd and others v Integradora de Servicios Petroleros Oro Negro SAPI de CV and others* [2023] SGHC 297 (the "GD") and also in our earlier grounds of decision concerning two interlocutory appeals in *Oro Negro Drilling Pte Ltd and others v Integradora de Servicios Petroleros Oro Negro SAPI de CV and others and another appeal (Jesus Angel Guerra Mendez, non-party)* [2020] 1 SLR 226 ("*Oro Negro (CA)*"). We reproduce below the facts necessary for the disposal of the present appeal.

7       As a matter of terminology, we note that restructuring proceedings commenced in Mexico are referred to as a *concurso* mercantile. As the Judge did at [8] of his GD, we refer to such restructuring proceedings as a "*concurso*". A *concurso* is governed by the Mexican Business Reorganisation Act, which in Spanish is known as the Ley de Concursos Mercantiles ("LCM"). For avoidance of doubt, in referring to the specific restructuring proceedings commenced in Mexico on behalf of the respondents by way of six *concurso* petitions, we refer to them as the "*Oro Concursos*" (see above at [2]).

*The parties*

8       The six respondents are companies incorporated in Singapore (hereinafter and collectively, the "respondents"). The respondents were the

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

plaintiffs in the underlying suit in OS 126, where they sought declaratory and injunctive relief against, among others, the appellant.

9       The first respondent is a holding company whose only assets are all the shares in the second to sixth respondents. The second to sixth respondents are special purpose vehicles incorporated to each own a single offshore jack-up drilling rig operating in Mexico ("SPV").

10      The first respondent was a wholly owned subsidiary of the first defendant in OS 126, Integradora de Servicios Petroleros Oro Negro, SAPI de CV ("Integradora"), until September 2017. The first respondent has since become a wholly owned subsidiary of the bondholders' nominee upon an event of default declared in September 2017.

11      Integradora's ultimate holding company is a Mexican state-owned gas and oil company known as Petróleos Mexicanos ("Pemex").

12      The appellant, Mr Gonzalo Gil White was the third defendant in OS 126. He was a director of each of the respondents until September 2017, and also a former director of Integradora.

13      A company that features in the background but who is not a party to the present dispute is a Mexico-incorporated company, Perforadora Oro Negro S de RL de CV ("Perforadora"). Perforadora is 99.25% owned by Integradora, with another subsidiary of Pemex owning the remaining 0.75% shares. Perforadora was responsible for chartering each rig from each SPV under a bareboat charter, and subsequently sub-chartering each rig to a subsidiary of Pemex for deployment in offshore oil drilling operations in Mexico.

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

***The underlying dispute***

*The bond agreement*

14      To raise the funds that each SPV needed to purchase each rig, the first respondent issued over US$900m in bonds in January 2014. The terms of this issuance are contained in a bond agreement, which is governed by Norwegian law. A reputable financial institution in Norway was appointed as trustee for the bondholders (the "Bond Trustee"). The bonds were supported by a guarantee from Integradora and a charterer's undertaking from Perforadora.

15      The bond agreement stipulated the following:

(a)      Clause 13.5(a) of the bond agreement required the first respondent to procure that its constitution and the constitutions of the SPVs were all amended to provide expressly for the right of the Bond Trustee to appoint a director in each respondent (the "Independent Director") and that the Independent Director's vote was required "under all circumstances and in all cases" for any respondent to commence any insolvency or restructuring proceeding anywhere in the world, including without limitation a *concurso* (an "Insolvency Matter").

(b)      Clause 15.1(a) of the bond agreement gave the Bond Trustee the power to declare an event of default if the first respondent failed to fulfil any payment obligation under the bond agreement.

(c)      Clause 15.1(g) of the bond agreement gave the Bond Trustee the power to declare an event of default if any of the six respondents, Integradora or Perforadora, in any jurisdiction, took any step concerning an Insolvency Matter.

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

16      As security for its obligations under the bond agreement, the first respondent charged all of its shares in the SPVs to the Bond Trustee for the benefit of bondholders. As security for its obligations under its guarantee, Integradora charged all of its shares in the first respondent to the Bond Trustee for the benefit of bondholders. Furthermore, as part of their security for their obligations under the bond agreement and guarantee respectively, the first respondent and Integrodora were obliged to procure each of the respondents to do the following:

> (a)      To amend their constitutions to incorporate and entrench a new article in compliance with cl 13.5(a) of the bond agreement. This was subsequently done via the insertion of Art 115A into the constitutions of the respondents. Art 115A prohibited each respondent and its directors from carrying into effect an Insolvency Matter unless two conditions are met. The respondent's shareholder had to vote in favour of doing so by passing an ordinary resolution to that effect *and* that respondent's Independent Director had to vote in favour of doing so, presumably at a duly convened meeting of the directors of that respondent.

> (b)      To appoint the Bond Trustee's nominee as an Independent Director. Mr Noel Cochrane Jr ("Mr Cochrane") was appointed on 29 September 2016 as the Independent Director of each respondent. His approval vote was therefore needed to carry into effect any Insolvency Matter.

17      Between 2015 and 2017, Pemex took certain actions which threatened the solvency of both Perforadora and the respondents and thereby risked triggering an event of default under cl 15.1(a) of the bond agreement (see *Oro Negro (CA)* at [20]).

6

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd* [2024] SGCA 9

*The granting of powers of attorney to the Guerra Lawyers*

18     On 31 August 2017, without the Independent Director's knowledge and approval, Mr Alonso Del Val Echeverria ("Mr Alonso") and the appellant granted a power of attorney on behalf of each respondent to lawyers in a Mexican firm called Guerra González y Asociados (the "Guerra Lawyers"). Each power of attorney was, by its express terms, a "General Power of Attorney for litigations … with all general authorities and even with the special authorities" empowering the Guerra Lawyers, among other things, to "file … all kinds of proceedings" on each respondent's behalf (the "Guerra POAs"). The scope of these powers of attorney extended to filing *concurso* petitions on the respondents' behalf.

## Procedural history

*The filing of* concurso *petitions by the Guerra Lawyers*

19     On 11 September 2017, the Guerra Lawyers filed a *concurso* petition in Mexico on behalf of Perforadora. This constituted an event of default under cl 15.1(g) of the bond agreement (GD at [44]). This allowed the Bond Trustee to vest ownership and control of the respondents in the bondholders' nominee, raising the prospect of the SPVs under the bondholders' ownership and control terminating Perforadora's charters of the rigs and requiring Perforadora to deliver possession of the rigs to the SPVs. The Guerra Lawyers, therefore, sought orders from the *concurso* court to restrain the SPVs from doing so.

20     At the same time, Integradora, Mr Alonso and the appellant took steps to engage the Guerra Lawyers to file *concurso* petitions on the respondents' behalf "in the event that it became necessary to do so", *ie*, if it became necessary

to prevent the SPVs from terminating the bareboat charters and taking possession of the rigs (GD at [44]).

21      Thus, on 20 September 2017, Integradora (in its capacity as the sole shareholder of the first respondent) executed a resolution resolving, among other things: (a) to engage the Guerra Lawyers to file a *concurso* petition on behalf of the first respondent; and (b) to empower the Guerra Lawyers by way of a power of attorney to, among other things, seek or resist any proceedings on behalf of the first respondent (GD at [45]). On the same day, the first respondent (in its capacity as the sole shareholder of each SPV) executed resolutions to the same effect for each SPV. We refer to these resolutions collectively as the "Shareholders' Resolutions".

22      On 25 September 2017, as a result of the Perforadora *concurso* petition, the Bond Trustee declared an event of default under cl 15.1(g) of the bond agreement. The Bond Trustee therefore exercised its power under the bond agreement to submit to the respondents pre-signed letters from Mr Alonso and the appellant to resign as directors of each respondent and to appoint in their place Mr Roger Hancock ("Mr Hancock") and Mr Roger Bartlett ("Mr Bartlett"). In May 2022, Mr Lambertus Hendrik Veldhuizen ("Mr Veldhuizen") was appointed a director of the SPVs.

23      On 29 September 2017, the Guerra Lawyers filed a *concurso* petition on behalf of Integradora. The same day, the Guerra Lawyers also filed six *concurso* petitions, one in the name of each respondent. We refer to these petitions as the "*Oro* Petitions". This led to the commencement of the *Oro Concursos* (see above at [2]). The appellant accepts that on the day the Guerra Lawyers filed the *Oro* Petitions, the respondents' directors did not comply with Art 115A. It is not disputed that the Bond Trustee and the respondents' directors were

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

unaware that the Guerra Lawyers had filed the *Oro* Petitions. No respondent could convene a meeting of its directors to resolve to carry into effect the Shareholders' Resolutions. No possibility, therefore, arose of Mr Cochrane being given at least 48 hours prior notice in writing of any such meeting or of Mr Cochrane voting with respect to the Shareholders' Resolutions as required by Art 115A.

24      On 3 October 2017, Pemex caused its subsidiary to terminate its contract with Perforadora. The contractual consequence was the termination of each sub-charter between each SPV and Perforadora for each rig.

25      On 4 October 2017, the Bond Trustee exercised its power to perfect its security under the charges by procuring the transfer of all of Integradora's shares in the first respondent to the bondholders' nominee, the first respondent, Oro Negro Drilling Pte Ltd. On and after 4 October 2017, the bondholders, through the Bond Trustee and their nominee, assumed legal ownership of the first respondent and, through the first respondent, of all of the SPVs.

26      On 6 October 2017, Oro Negro Drilling Pte Ltd, as the respondents' shareholder, and the respondents' directors, Mr Hancock, Mr Bartlett and Mr Cochrane, discovered the *Oro* Petitions. As a result, on 9 October 2017, the directors of each respondent passed a directors' resolution resolving (GD at [52]):

        (a)      to revoke all authority previously given by that respondent to any person to represent that respondent, whether by way of a power of attorney or otherwise;

        (b)      to appoint nine named lawyers from a Mexican law firm called Cervantes Sainz Abogados S.C. (the "Sainz Lawyers") to represent each

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

of the respondents in all Mexico proceedings in respect of any disputes with Integradora and Perforadora and in all negotiations with Pemex; and

(c)     to grant a power of attorney to the Sainz Lawyers, clothing them with the necessary authority.

27     From this point on, both the Guerra Lawyers and the Sainz Lawyers claimed to be the lawful legal representatives of the respondents in the *Oro Concursos* as well as in Integradora's and Perforadora's *concursos* (GD at [53]).

*The course of litigation in OS 126 before the Singapore courts*

28     On 26 January 2018, four months after the Guerra Lawyers filed the *Oro* Petitions, the respondents filed OS 126 in the Singapore High Court seeking the following final relief against the three defendants in the suit, *viz*, Integradora, Mr Alonso and the appellant (GD at [72]):

(a)     a declaration that the *Oro* Petitions were invalidly filed for failure to comply with Art 115A;

(b)     a declaration that Integradora, Mr Alonso and the appellant have no authority to maintain the *Oro* Petitions on behalf of the respondents or to deal with the respondents' assets; and

(c)     injunctions to prevent Integradora, Mr Alonso and the appellant from commencing, continuing or maintaining the *Oro* Petitions or any other Insolvency Matter on behalf of any of the respondents whether in reliance on the Shareholders' Resolutions or otherwise.

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

29     In the interim, the respondents also filed HC/SUM 482/2018, where they sought and obtained *ex parte*: (a) interim injunctions against Integradora, Mr Alonso and the appellant which mirrored the injunctions prayed for in OS 126 ("Interim Injunctions"); and (b) the court's leave to serve OS 126 out of Singapore ("Overseas Service Order"). In response, Integradora, Mr Alonso and the appellant filed HC/SUM 2473/2018 to set aside the Interim Injunctions and the Overseas Service Order. This was heard by a judge of the High Court who set aside the Overseas Service Order as well as the Interim Injunctions.

30     On 12 September 2019, we allowed the appeals brought by the respondents against this decision, thereby restoring the Interim Injunctions (*Oro Negro (CA)* at [4]). As there was no time limit imposed on the Interim Injunctions, they remained in force from September 2019 up to March 2023, the time when final judgment was entered in favour of the respondents in OS 126 by the court below. As such, at all material times, the Interim Injunctions remained binding on the defendants including the appellant.

31     The respondents thereafter sought final judgment against Integradora and the appellant in the following terms (GD at [77]):

>     (a)     A declaration that each of the Shareholders' Resolutions cannot enable the respondents to seek a *concurso* or any other Insolvency Matter, without first securing Mr Cochrane's affirmative vote.

>     (b)     A declaration that Integradora and the appellant have no authority to cause, and shall not cause, the respondents to continue and/or maintain any *concurso* or any other Insolvency Matter in Mexico or elsewhere purportedly on behalf of the respondents.

11

(c)     A declaration that Integradora and the appellant have no authority to act for any of the respondents or to deal with the respondents' assets in any matter.

(d)     An injunction to restrain Integradora and the appellant from relying on and/or continuing to rely on the Shareholders' Resolutions to cause the respondents to continue or maintain any *concurso* or any other Insolvency Matter in Mexico or elsewhere purportedly on behalf of the respondents.

(e)     An injunction to restrain Integradora and the appellant from continuing or maintaining any *concurso* or any other Insolvency Matter or other legal action in Mexico or elsewhere purportedly on behalf of the respondents.

(f)     An order that Integradora, Mr Alonso and the appellant pay the respondents damages to be assessed.

*The decisions of the Mexican courts in the* Oro Concursos

32     Having set out the course of litigation in Singapore above, we return to trace the decisions which were rendered in Mexico in the *Oro Concursos*. These decisions in chronological order, include the following (as summarised by the Judge in his GD at [57]–[61]):

(a)     *2 May 2018*: Having considered the Sainz Lawyers' application, the *concurso* court dismissed the *Oro* Petitions because the respondents' directors had failed to comply with Art 115A. The Guerra Lawyers filed a motion inviting the *concurso* court to reconsider its decision. In June 2018, the *concurso* court dismissed the motion.

(b)     *19 September 2018*: A higher tribunal known as the *amparo* court which hears appeals on constitutional grounds annulled the *concurso* court's decision and directed it to consider whether Art 115A conflicted with the principles of Mexican insolvency law.

33     The following decisions rendered in the *Oro Concursos* post-date our decision in *Oro Negro (CA)* on 12 September 2019 where we restored the Interim Injunctions:

(a)     *20 September 2019*: The *concurso* court reaffirmed its decision to dismiss the *Oro* Petitions for failure to comply with Art 115A. The Guerra Lawyers again appealed to the *amparo* court.

(b)     *15 October 2020*: The *amparo* court again annulled the *concurso* court's decision and directed it to consider whether it had the power to disapply Art 115A for the sole purpose of considering whether to admit the *Oro* Petitions because Art 115A conflicted with the principles of Mexican insolvency law and Mexican public policy.

(c)     *14 December 2020*: The *concurso* court reaffirmed its decision to dismiss the *Oro* Petitions for failure to comply with Art 115A. The Guerra Lawyers again appealed to the *amparo* court.

(d)     *17 June 2021*: The *amparo* court again annulled the *concurso* court's decision. It directed the *concurso* court to consider whether cl 15.1(g) of the bond agreement (and therefore the declaration of an event of default and the transfer of Integradora's shares in the first respondent to OND Pte Ltd) and Art 115A were nullified by Art 87 of the LCM. Art 87 of the LCM renders unenforceable any term in a contract that imposes a detriment on a merchant by the mere fact of

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

commencing insolvency or restructuring proceedings, *eg*, by filing a *concurso* petition. Contractual terms that have this effect are commonly referred to as *ipso facto* clauses.

(e)    *1 December 2021*: The *concurso* court finally admitted the *Oro* Petitions. It held that "for the sole and exclusive" purpose of considering whether to admit the *Oro* Petitions, Art 87 of the LCM had the effect of excluding the legal impediments in Art 115A for filing a *concurso* petition. The *concurso* court rested its power to disapply Art 115A on the fact that each respondent, although incorporated in Singapore, had its centre of main interests in Mexico and was, until September 2017, ultimately owned by another company (*ie*, Integradora) that also had its centre of main interests in Mexico and whose separate *concurso* had been admitted in October 2017 together with the *concurso* of its subsidiary Perforadora.

(f)    *26 January 2022*: The Sainz Lawyers appealed to the *amparo* court against the *concurso* court's decision admitting the *Oro* Petitions.

34    As mentioned above at [30], there was no time limit imposed on the Interim Injunctions. They thus remained in force from September 2019 up to March 2023, the time when the final judgment was entered in favour of the respondents in OS 126. As such, at all material times, the Interim Injunctions remained binding on the defendants including the appellant. To the extent that these decisions had been the result of the appellant's continuation of the *concurso* petition on behalf of the respondents in Mexico, these decisions would have been procured in breach of our decision in *Oro Negro (CA)*.

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

*The litigation before the Mexican courts in respect of Integradora's and Perforadora's* concursos

35      In parallel with the litigation in the *Oro Concursos*, litigation proceeded in respect of Integradora's and Perforadora's *concursos* on a separate issue: whether the *concurso* court should suspend the effects of the event of default, and thereby suspend the effect of the transfer of ownership and control of the respondents to the bondholders' nominees on the premise that cl 15.1(g) of the bond agreement was nullified by Art 87 of the LCM or Mexican public policy (GD at [62]). The litigation proceeded in the following manner (GD at [63]–[68]):

(a)      *18 September 2018*: The Guerra Lawyers filed a motion to suspend the effects of the event of default on the basis that cl 15.1(g) of the bond agreement contravened Art 87 of the LCM and Mexican public policy.

(b)      *11 October 2018*: The *concurso* court dismissed the motion for lack of jurisdiction. The *concurso* court highlighted that the bond agreement was governed by Norwegian law and that the Bond Trustee benefited from a one-sided exclusive jurisdiction clause in favour of the Norwegian courts.

(c)      *25 February 2019*: The *concurso* court dismissed the Guerra Lawyers' motion for reconsideration. The Guerra Lawyers' further appeal to the *amparo* court was dismissed. The Guerra Lawyers filed a further appeal to a Mexican federal court.

(d)      *1 October 2020*: The Mexican federal court allowed the Guerra Lawyers' appeal, finding that the *concurso* court did possess the jurisdiction to determine whether Art 87 of the LCM and Mexican public

15

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                     [2024] SGCA 9

policy nullified cl 15.1(g) of the bond agreement for the purposes of a *concurso*. The federal court reasoned that while the validity of cl 15.1(g) of the bond agreement was governed by Norwegian law and was subject to the jurisdiction of the Norwegian courts, the effect of cl 15.1(g) was to allow Perforadora to be dispossessed of the rigs and thereby end any prospect of a successful *concurso*. Before the *concurso* court, the issue was whether, in light of its effect on Perforadora's *concurso*, cl 15.1(g) was unenforceable under Art 87 of the LCM and contrary to Mexican public policy. That issue is governed by Mexican law, not Norwegian law.

(e)    *22 February 2021*: The *concurso* court suspended the effects of the Bond Trustee's declaration of an event of default. It held that cl 15.1(g) of the bond agreement imposes a detriment on the first respondent by the mere fact of Perforadora commencing insolvency or restructuring proceedings. Art 87 of the LCM, therefore, empowered the *concurso* court to "legally disregard" and revoke cl 15.1(g), with all consequences flowing from the declared event of default "rendered invalid".

(f)    *9 August 2022 and 23 November 2022*: The *concurso* court recognised the Guerra Lawyers as the "legal representatives" of the respondents in filing the *Oro* Petitions and in maintaining the *Oro Concursos* under the Shareholders' Resolutions and the August 2017 Guerra POAs.

36    Again, to the extent that the Mexican decisions post-dating our 2019 decision in *Oro Negro (CA)* had been procured via the continuation of any legal

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

action purportedly on the respondents' behalf, these decisions would have been procured in breach of the Interim Injunctions.

37      As the Judge observed in the GD at [69], as a result of the *concurso* court's decisions in February 2021 in respect of Integradora's and Perforadora's *concursos* and on 1 December 2021 in respect of the respondents' *Oro* Petitions, the *Oro Concursos* now continue on the footing that: (a) the respondents' directors did not have to comply with Art 115A to carry into effect the Shareholders' Resolutions before filing the *Oro* Petitions; and (b) the Guerra Lawyers (and not the Sainz Lawyers) have the authority to represent the respondents in the *Oro Concursos* and in Integradora's and Perforadora's *concursos*.

**The decision below**

38      The Judge considered that to secure a final judgment against Integradora and the appellant, each respondent must first establish a legal basis on which to enter that judgment (GD at [79]). That basis must either be a cause of action recognised by Singapore law as a basis for granting the final relief or a statutory basis for granting such relief. In this regard, the Judge found that a legal basis for granting the final relief against the appellant lies in an implied contract between each of the respondents and the appellant, which incorporated the substance of Art 115A as part of its terms (GD at [87]–[88]). The Judge noted (at [90]) that this Court had, in granting interlocutory relief in *Oro Negro (CA)* at [60], decided that there was a good arguable case that Mr Alonso and the appellant were contractually bound by Art 115A simply by virtue of having accepted their appointment as directors of the respondents. The obligation in Art 115A was a term of the appellant's contract *qua* director with each respondent (GD at [106]). By causing each respondent to file a *concurso* petition

17

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                         [2024] SGCA 9

without Mr Cochrane's vote of approval, the appellant had breached the implied contract between himself and each respondent and is liable for damages to each respondent and is to be restrained by injunction from continuing his breach (GD at [109]).

39     With respect to Integradora, the Judge accepted that the legal basis for granting the final relief against Integradora lay in its inducement of the appellant to breach his implied contract with the respondents (GD at [111]). The Judge found that the elements for the tort of inducement of breach of contract have been made out to provide the legal basis to grant final relief against Integradora.

40     As there was a legal basis to grant the reliefs sought, the Judge next considered and rejected the grounds raised by the appellant for opposing the grant of final relief. The Judge rejected the appellant's claim that OS 126 is an abuse of the court's process.

41     Concerning the claim that OS 126 relitigates or duplicates issues in the *Oro Concursos* that the Mexican courts have decided, the Judge accepted that there was an identity of parties between OS 126 and the *Oro Concursos*. In doing so, the Judge found that an extended test should apply to determine the identity of parties for the purposes of the abuse of process analysis where insolvency and restricting proceedings are involved such as the consolidated *concursos* (GD at [137]–[150]). Under this extended test, the focus would be on the person over whom the insolvency court exercised jurisdiction in entering judgment or making an order (GD at [149]). However, the Judge nonetheless considered that OS 126 did not duplicate the *Oro Concursos* because it concerned issues different from those raised in the *Oro Concursos* (GD at [152]–[155]). Furthermore, the relief the respondents sought in the *Oro Concursos* differed from that in OS 126 (GD at [156]–[160]). The issues raised

in OS 126 are issues of Singapore contract law, tort law and company law and thus differ from the issues of Mexican insolvency law and public policy raised before the Mexican courts (GD at [166]). The Judge rejected the appellant's submission that OS 126 was barred by the extended doctrine of *res judicata* (GD at [167]–[168]).

42     The Judge also rejected the appellant's submission that granting the respondents the relief they sought would result in a breach of judicial comity. The permanent injunctions could not be classified as either anti-suit or anti-enforcement injunctions. Neither would the granting of final relief interfere with the execution of the Mexican judgments in Mexico (GD at [197]) or nullify the Mexican decisions (GD at [199]). Even if the effect of the final judgment entered is to interfere with or nullify the Mexican judgments, this was not a relevant consideration in light of the finding that the injunctions are neither anti-suit injunctions nor anti-enforcement injunctions. Considerations of comity therefore did not arise (GD at [200]).

43     Finally, the Judge rejected the appellant's submission that the relief which the respondents sought was futile (GD at [206]–[207]).

44     For the reasons above, the Judge allowed the respondents' application for final relief in in OS 126 and entered final judgment against Integradora and the appellant in the following terms (GD at [78]):

> (a)     A declaration that none of the Shareholders' Resolutions is sufficient to authorise or empower any director of the respondents to carry into effect any Insolvency Matter.

(b)      A declaration that the only directors of the first respondent are Mr Cochrane, Mr Hancock and Mr Bartlett, with effect from the dates of their respective appointment.

(c)      A declaration that the only directors of each SPV are Mr Cochrane, Mr Hancock, Mr Bartlett and Mr Veldhuizen with effect from the dates of their respective appointment.

(d)      A declaration that neither Integradora nor the appellant has the authority of, or a power conferred by, any of the respondents to cause or attempt to cause any of the respondents to do any of the following:

(i)      to commence, continue or maintain any Insolvency Matter (as defined in Art 115A) in Mexico or elsewhere, purportedly on behalf of any of the respondents; or

(ii)      to instruct legal representatives in Mexico or elsewhere to commence, continue or maintain any Insolvency Matter (as defined in Art 115A) in Mexico or elsewhere purportedly on behalf of any of the respondents.

(e)      An injunction restraining Integradora and the appellant from commencing, continuing or maintaining any Insolvency Matter (as defined in Art 115A) in Mexico or elsewhere purportedly on behalf of any of the respondents.

(f)      An injunction restraining Integradora and the appellant from instructing legal representatives in Mexico or elsewhere to commence, continue or maintain any Insolvency Matter (as defined in Art 115A) in Mexico or elsewhere purportedly on behalf of any of the respondents.

(g)     An order that the appellant pay damages to the respondents, such damages to be assessed, for his breach of the implied contract between himself and each respondent which incorporates the substance of Art 115A as a term.

45     The Judge further ordered Integradora and the appellant to pay the respondents a single set of the respondents' costs of and incidental to the application, fixed at $25,000, including disbursements (GD at [212]). The assessment of the damages payable to the respondents by Integradora and the appellant has been adjourned pending the outcome of this appeal.

**The Parties' cases on appeal**

***The Appellant's case***

46     The appellant's case on appeal was essentially a re-iteration of its submissions below. There were three main pillars to the appellant's case.

47     The Judge failed to properly consider the principles of *res judicata* and abuse of process. As regards abuse of process, the Judge erred when he rejected the appellant's submission that OS 126 duplicates the *Oro Concursos* when he found that the proceedings neither raised the same or similar issues nor concerned the same reliefs sought. The Judge also erred in rejecting the appellant's alternative submission on abuse of process that the respondents sought to mount a collateral attack on the Mexican decisions in OS 126.

48     The appellant averred that the Judge erred in rejecting the appellant's submission that OS 126 triggers issues of *res judicata*. As with the Judge's analysis on abuse of process, while the Judge rightly accepted that there was an identity of parties between the Singapore and Mexico proceedings, the Judge

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

was wrong to find that there was no identity of issues. The Judge wrongly focussed his reasoning on the *type* of the *Oro Concursos*. Rather, *res judicata* should depend on the *nature* of the issues decided by the court and whether these issues are being relitigated.

49     The Judge erred in disregarding the principle of comity as espoused by this Court in *Sun Travels & Tours Pvt Ltd v Hilton International Manage (Maldives) Pvt Ltd* [2019] 1 SLR 732. The Mexican courts have decided the following: (a) Art 115A is unconstitutional as a matter of Mexican Law; (b) the *Oro Concursos* are valid and legally admitted under Mexican law; and (c) that the Guerra Lawyers possess the power under the Guerra POAs to bring and maintain the *Oro Concursos*. The orders granted below directly contradict these Mexican decisions. Furthermore, the Judge erred in finding that the injunctions were neither anti-suit nor anti-enforcement injunctions, concluding that considerations of comity would thus fall away. Additionally, contrary to the Judge's decision, the orders and declaratory relief granted in OS 126 would interfere with and/or nullify the Mexican decisions.

50     The Judge erred in finding that the relief sought in OS 126 is not futile. The injunctions granted do not operate to restrain the Guerra Lawyers and would not have any effect on the restructuring proceedings in Mexico. Furthermore, the Guerra Lawyers were not the servants and/or agents of the appellant, such that the injunctions would not have any effect on the Mexico proceedings.

**The respondents' case**

51     The respondents submitted that the Judge's reasoning for granting final judgment as set out in the GD should be upheld. The respondent averred that

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

OS 126 did not raise issues of *res judicata* and/or abuse of process. The essence of the respondents' case was that there is no identity of issues. The Judge rightly found that the issues in OS 126 arose purely under Singapore contract, tort and company law. These issues operated on a separate plane from the issues before the Mexican courts.

52     In any case, the respondents submitted that any preclusive effect of the Mexican decisions should be disregarded on the basis that they were commenced in breach of the respondents' constitutions under the illegal Guerra POAs and that the continuation of the Mexico proceedings was in breach of the interim injunctions reinstated by this Court in *Oro Negro (CA)*.

53     The respondents submitted that the Judge rightly found that considerations of comity were not engaged because the injunctions in OS 126 were neither anti-suit nor anti-enforcement injunctions.

54     Finally, the Judge rightly found that the orders granted in OS 126 were not futile as the orders would restrain the appellant and Integradora, as well as their servants or agents, from purporting to act on behalf of the respondents in breach of the respondents' constitutions, not just in Mexico but anywhere else in the world. Furthermore, the Judge was correct to find that the orders granted would be relevant if recognition was sought locally in the future concerning the *Oro Concursos*.

**Issues to be determined**

55     The four separate grounds raised by the appellant, *ie*, abuse of process, *res judicata*, breach of judicial comity and the futility of the permanent injunction were all predicated on essentially the same argument that there was

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

an identity of issues in OS 126 and the *Oro Concursos*. Hence, this was the primary question raised in the present appeal.

56      For reasons which we will elaborate below, there was no such identity of issues to sustain any of the appellant's arguments.

**Our decision**

***The court's power to order a permanent injunction***

57      As stated above at [31], the appellants sought final relief in OS 126 against Integradora and the appellant, which included among other things, a permanent injunction to restrain Integradora and the appellant from commencing and/or maintaining any *concurso* or any other Insolvency Matter in Mexico or elsewhere purportedly on behalf of the respondents.

58      Before proceeding further, we pause to make some observations on the basis of the court's power to grant the relief of a permanent injunction where an injunction had previously been granted on an interim basis.

59      An injunction is a court order prohibiting a person from doing something or requiring a person to do something. It is an equitable remedy used by the courts in a variety of cases to avoid injustice. Injunctions can be granted on either an interim or final basis. An interim (or interlocutory) injunction is granted at an early stage in the proceedings, pending the final disposal of a suit or action: *Tay Long Kee Impex Pte Ltd v Tan Beng Huwah (trading as Sin Kwang Wah)* [2000] 1 SLR(R) 786 at [46]. Where such an interim injunction is granted, it can continue until a specified date or until the disposal of the action.

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

60     The source of the court's power to grant interim injunctions is provided for in s 4(10) of the Civil Law Act 1909 (2020 Rev Ed), which states:

> **Injunctions and receivers granted or appointed by interlocutory orders**
>
> (10) A Mandatory Order or an injunction may be granted or a receiver appointed by an interlocutory order of the court, either unconditionally or upon such terms and conditions as the court thinks just, in all cases in which it appears to the court to be just or convenient that such order should be made.

61     The requirements for the grant of an interim injunction are at the discretion of the court. The generally applicable test for interim injunctions is that set out in *American Cyanamid Co v Ethicon Ltd* [1975] AC 396 ("*American Cyanamid*"): (a) there is a serious question to be tried; and (b) the balance of convenience lies in favour of granting the injunction. This general test is based on the fundamental principle that "the court should take whichever course appears to carry the lower risk of injustice if it should turn out to have been wrong at trial in the sense of granting relief to a party who fails to establish his rights at the trial, or of failing to grant relief to a party who succeeds at the trial": *RGA Holdings International Inc v Loh Choon Phing Robin and another* [2017] 2 SLR 997 ("*RGA Holdings*") at [28].

62     On the other hand, a final injunction is granted at the conclusion of the proceedings as part of the court's final judgment in a case. The threshold for the grant of a final injunction is generally higher than it is for an interim injunction. This is because in converting an interim injunction into a final injunction, the Court is going beyond assessing whether an interim injunction is necessary to protect the plaintiff's interests pending a full trial on the merits. At the interlocutory stage, the threshold for the grant of an interim injunction is necessarily lower given the early stage of proceedings and the fact that evidence is often tendered by way of affidavits untested through the process of cross-

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*          [2024] SGCA 9

examination. At this preliminary stage, the court avoids resolving conflicts of evidence on affidavit with respect to the facts on which the claims of either party may depend and also to decide difficult questions of law which may call for detailed argument: see *American Cyanamid* at 407. These matters are more properly reserved at the later, merits stage.

63     Previously, this Court had restored the Interim Injunctions in its decision in *Oro Negro (CA)*. There was no time limit imposed on these injunctions. As such, they remained in full force from 12 September 2019 up to March 2023, the time when final judgment was entered in favour of the respondents in OS 126. The appellant's counsel, Mr Paul Seah, rightly acknowledged at the hearing before us that where an interim injunction has previously been granted, the court necessarily possesses the power to convert this into a permanent injunction. Indeed, the court's power to grant a permanent injunction following the issuance of an interim injunction is rooted in its power to provide equitable relief to prevent the continuance of harm to a plaintiff's legal rights. This power finds statutory footing in s 18(2) read with para 14 of the First Schedule of the Supreme Court of Judicature Act 1969 (2020 Rev Ed) which provides that the General Division of the High Court has the "[p]ower to grant all reliefs and remedies at law and in equity".

64     In assessing whether the merits of the case warrant the grant of a permanent injunction, we agree with the Judge's observations at [79] of the GD that the grant of final relief requires a legal basis. This basis can lie in a cause of action recognised under Singapore law as a basis for granting the final relief. Alternatively, there can be a statutory basis for granting such relief. One example is s 270 of the Insolvency, Restructuring and Dissolution Act 2018 (2020 Rev Ed) ("IRDA") which empowers any person affected by a contravention of the IRDA to apply to the court for what is effectively either a

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

prohibitory injunction to restrain non-compliance with the IRDA or a mandatory injunction to compel compliance with the IRDA.

65     Earlier we observed the generally applicable test for interim injunctions is that set out in *American Cyanamid*. However, in a case involving a situation where a defendant is about to breach or has already breached, a negative covenant in a contract, an interim (or final) prohibitory injunction is normally granted as a matter of course to restrain a prospective breach or a further breach. In this connection, we repeat this Court's observations in *RGA Holdings* at [32]:

> 32 When a defendant is about to breach, or has already breached, a negative covenant in a contract, an interim prohibitory injunction will readily be granted to restrain a prospective breach or a further breach, as the case may be. A clear exposition of the applicable principles may be found in *Chitty on Contracts* Vol 1 (Hugh Beale gen ed) (Sweet & Maxwell, 32nd Ed, 2015) ("*Chitty on Contracts*") at paras 27-065 and 27-067. We summarise these principles as follows:
>
> > (a)   A prohibitory injunction to restrain the breach of a negative stipulation in a contract is normally granted as a matter of course.
> >
> > (b)   The court is not concerned with the balance of convenience. That damages would be an adequate remedy is not generally a relevant consideration.
> >
> > (c)   As the remedy is an equitable one, it is in principle discretionary, and it may be refused on the ground that it would cause particular hardship as to be oppressive to the defendant. But the burden caused by having to observe the contract does not qualify as hardship.
> >
> > (d)   These principles above apply equally to the grant of a final injunction as they do to the grant of an interim injunction.
>
> This is the same position expressed in the other standard reference works: see Edwin Peel, *Treitel on the Law of Contract* (Sweet & Maxwell, 13th Ed, 2011) at paras 21-051 and 21-053; Tham Chee Ho, "Non-compensatory Remedies" in *The Law of Contract in Singapore* (Andrew Phang Boon Leong gen ed) (Academy Publishing, 2012) ch 23 at paras 23.156 and 23.159; Steven Gee QC, *Commercial Injunctions* (Sweet & Maxwell, 6th Ed, 2016) ("*Commercial Injunctions*") at paras 2-012 to 2-014).

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

66      There was no question that Article 115A was a negative covenant requiring the respondents' directors to abstain from "carry[ing] into effect" any petition to place the respondents in *concurso* or any "Insolvency Matter[s]" without the Independent Director's approval. As the Judge observed at [88] of the GD, the legal basis for granting the final relief sought against the appellant lay in an implied contract between each of the respondents and the appellant that incorporated as a term the substance of Art 115A. This Court earlier accepted in *Oro Negro (CA)* at [60] that there was a good arguable case that the appellant was contractually bound by Art 115A by virtue of having accepted the appointment as a director of the respondents. The Judge found that not only had the respondents established that there was a good arguable case supporting interlocutory relief but there was also such a case on the merits to provide sufficient legal basis for the grant of final injunctive relief (GD at [90]). In this connection, the Judge rightly found that the appellant breached the implied contract in the terms of Art 115A between himself and each respondent and was thus liable to be restrained by an injunction from continuing his breach. The appellant did not appeal against this part of the Judge's decision and we saw no reason to depart from the Judge's conclusion, as it was in line with our earlier decision in *Oro Negro (CA)*.

**The true nature of the relief sought in OS 126**

67      One of the primary pillars of the appellant's case rested on his argument that the relief sought was, in essence, an anti-suit or anti-enforcement injunction. Such relief should not be granted as it would result in a breach of judicial comity. In examining whether considerations of comity arose, it was necessary for us to consider the true nature of the relief sought in OS 126. As this Court stated in *Oro Negro (CA)* at [1], not all injunctions which have the *effect* of restraining the pursuit of or participation in foreign proceedings can be

28

classified as anti-suit injunctions (or for that matter, anti-enforcement injunctions). It is not the case that the considerations of comity inherent in the grant of anti-suit or anti-enforcement injunctions automatically arise merely because the injunctions in OS 126 appear to bear the same effect as that of anti-suit or anti-enforcement injunctions. A proper classification of the precise nature of the injunction in this case was crucial as it allowed for the correct framing of the issues, which in turn impacted on the correct application of the governing legal principles.

68      In our view, the reliefs sought in OS 126 could not be classified as either an anti-suit or anti-enforcement injunction. As we observed in *Oro Negro (CA)* at [99], an anti-suit injunction is "an injunction against a person enjoining him from commencing or continuing with proceedings in a court or tribunal abroad", citing Steven Gee QC, *Commercial Injunctions* (Sweet & Maxwell, 6th Ed, 2016). The effect of the injunctions in OS 126 did not *per se* restrain the respondents from maintaining the *Oro Concursos*. Instead, the injunctions merely restrained a former shareholder of the first respondent (*ie*, Integradora) and a former director of the respondents (*ie*, the appellant) from purporting to act on behalf of the respondent in maintaining the *Oro Concursos*. In other words, the injunctions were specifically targeted at Integradora and the appellant. They did not enjoin either Integradora or the appellant from commencing or continuing with the proceedings in a foreign court in their name. All that the injunctions sought to do is to restrain the appellant and Integradora from purporting to act on the respondents' behalf in breach of a negative covenant in the form of Art 115A as a matter of Singapore law. While it was true that the injunctions in OS 126 had the practical effect of putting an end to the *Oro Concursos*, that would only have been a consequence of the appellant possessing no cause of action in his name against the respondent.

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

### There was no scope for the consideration of comity in the present case

69     Having determined that the true nature of the injunctive relief in OS 126 was neither an anti-suit nor an anti-enforcement injunction, it followed that considerations of comity which typically takes centre stage in the grant of such injunctions do not arise: see *Oro Negro (CA)* at [100]. Nonetheless, we noted that the appellant sought to impress upon us the argument that comity remained relevant because the Mexican courts, since our decision in *Oro Negro (CA)*, had the opportunity to consider Art 115A and ruled that despite an ostensible breach of this article, the *Oro Concursos* were valid. This line of argument raised the question of the relevance of comity in situations where an allegedly inconsistent foreign judgment *post-dates* a local decision and where the foreign judgment had allegedly been obtained in breach of the local decision. To unpack this argument, we must explore the scope of the doctrine of comity and its interplay with the notion of sovereignty. In doing so, we explain why the local court should *not* give effect to such judgments.

70     Comity has been described as a concept of "very elastic content": *Dicey, Morris and Collins on the Conflict of Laws* (Lord Collins of Mapesbury gen ed) (Sweet & Maxwell, 16th Ed, 2022) at para 1-008. It has been defined variously as "the basis of international law, a rule of international law, a synonym for private international law, a rule of choice of law, courtesy politeness, convenience or goodwill between sovereigns, a moral necessity, expediency, reciprocity or considerations of high international politics concerned with maintaining amicable and workable relationships between nations": Joel R Paul, "Comity in International Law" (1991) 32 Harv. Int'l L.J. 1 at 3–4. Given the definitional ambiguity behind the concept of comity, the concept has been viewed as lacking sufficient utility in the process of legal reasoning: Adrian Briggs, "The Principle of Comity in Private International Law" (2012) 354

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd* [2024] SGCA 9

Recueil des Cours 65 ("*The Principle of Comity in Private International Law*"). Indeed, we earlier observed in *The Republic of India v Deutsche Telekom AG* [2024] 1 SLR 56 ("*Deutsche Telekom*") at [67] that "international comity functions only as an underlying consideration without normative force".

71      Historically, the subject on which comity operates has vacillated between either nations or courts. As observed by Elisa D'Alterio in "From judicial comity to legal comity: A judicial solution to global disorder?" (2011) 9(2) International Journal of Constitutional Law 394 at 399–400, comity was historically employed as operating between nations ("international comity" or "comity of nations"), with later usages employing it in reference to the activities of the courts ("judicial comity"). However, in the local private international law cases, the jurisprudence is settled that comity operates between nations. In the context of the doctrine of *forum non conveniens*, this point was clarified by this Court in *The "Rainbow Joy"* [2005] 3 SLR(R) 719 ("*Rainbow Joy*"). In rejecting the argument that the doctrine of *forum non conveniens* could only come into play if the alternative forum in another country is a court of law and not when it is a special tribunal, this Court emphasised that comity operates between *nations*, not between *courts* of law of nations (*Rainbow Joy* at [18]). Accordingly, each country possesses the sovereign right to determine the manner and process by which disputes should be resolved (*Rainbow Joy* at [18]). In the context of anti-suit injunctions, comity has similarly been expressed as operating between nations: *Beckkett Pte Ltd v Deutsche Bank AG and another* [2011] 1 SLR 524 at [46]; *Morgan Stanley Asia (Singapore) Pte (formerly known as Morgan Stanley Dean Witter Asia (Singapore) Pte) and others v Hong Leong Finance Ltd* [2013] 3 SLR 409 at [80].

72      In the specific context of the recognition of foreign judgements, comity has also been expressed as a concept operating between nations though we

should add that the distinction between comity between nations and between courts might not have been contemplated or fully appreciated at that time. From as early as Bucknill CJ's decision in the Straits Settlement case of *Ralli and another v Anguilla* [1915-23] XV SSLR 33, it was the "comity of nations" which underlies the recognition of foreign judgements. This Court's decision in *Hong Pian Tee v Les Placements Germain Gauthier Inc* [2002] 1 SLR(R) 515 provides a modern account of the nature of comity in the context of the rules governing the recognition of foreign judgements. There, this Court (at [30]) relied on the "doctrine of comity of nations" in rejecting the application of the expansive rule laid down in *Abouloff v Oppenheimer & Co* [1882] 10 QBD 295 for challenging the recognition of foreign judgements due to fraud. This Court (at [30]) instead preferred the approach taken by the Canadian and the Australian cases that where an allegation of fraud had been considered and adjudicated upon by a competent foreign court, the foreign judgement may be challenged on the ground of fraud only where fresh evidence has come to light. Importantly, it must be shown that this fresh evidence could not be uncovered even if the defendant exercised reasonable diligence, and that this fresh evidence would have been likely to make a difference in the eventual result of the case. This Court found this test to be consistent with the doctrine of comity of nations, as it avoids any appearance that this court is sitting in an appellate capacity over a final decision of a foreign court (at [30]). More recently, this Court has also referred to comity "between states" in outlining its role as one of three possible bases undergirding the recognition of foreign judgments and transnational issue estoppel: *Merck Sharp & Dohme Corp (formerly known as Merck & Co, Inc) v Merck KGaA (formerly known as E Merck)* [2021] 1 SLR 1102 ("*Merck*") at [31].

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*          [2024] SGCA 9

73     It was once thought that comity meant nothing more than "mere courtesy" or more euphemistically, a judicial attitude: see, *eg*, *Hughes v Cornelius* (1680) 2 Show 232. As we observed in *Merck* at [31], the rejection of comity as a basis for the recognition of foreign judgments by the English courts in *Godard and Another v Gray and Another* (1870) LR 6 QB 139 in favour of the obligation theory appears to be explainable by the English courts' rejection of the idea that comity operates purely as a matter of discretionary courtesy. Indeed, comity has been expressed to lie somewhere between an absolute obligation, and mere courtesy as can be seen from the case of *The "Reecon Wolf"* [2012] 2 SLR 289 at [23]. In that case, Belinda Ang J (as she then was) cited the definition of comity as expressed by La Forest J in the Canadian case of *Morguard Investments Ltd v De Savoye* [1990] 3 SCR 1077 at 1096 which concerned the recognition of inter-provincial judgements:

> 'Comity' in the legal sense is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws …

74     From the above description, it can be seen that comity is a concept closely connected to the principle of sovereignty that calls for respect to be accorded to the territorial sovereignty of other states. Thus it is the case, as Briggs argues, that although comity suffers from definitional ambiguity given the different meanings ascribed to it, its core meaning is fundamentally concerned with mediating respect for the territorial sovereignty of states with a stake in a private international law matter: *The Principle of Comity in Private International Law* ([70] *supra*). Indeed, the interplay between sovereignty and comity is succinctly captured in the comments of the Law Reform Committee on the limits of transnational issue estoppel which followed on the heels of our

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd* [2024] SGCA 9

decision in *Merck* in early 2021 (Law Reform Committee, *Report on the Framework and Margins of Transnational Issue Estoppel* (May 2023) (Author: Colin Seow) at para 6):

> 6 The more sophisticated analysis involved when applying transnational issue estoppel stems principally from the interplay between the concepts of state sovereignty and international comity. On the one hand, it is a well-established principle under the precepts of state sovereignty in the international legal order as we know that national court judgments enjoy no automatic transnational or extra-territorial effect. Yet on the other hand, international comity encourages national courts around the world to give transnational effect to each other's competent determination on matters involving the same parties and the same subject matter, as a gesture of international respect at the same time as this could help minimise the economic cost of litigation transnationally.

75     From a historical perspective, the doctrine of sovereignty arose from the 1648 treaties of Westphalia which established the legal-political foundations of the modern state: see Thomas Schultz & Jason Mitchenson, "The History of Comity" (2019) 5 Journal of International Legal History 383. Under the principle of sovereignty, a state possesses full legal competence to exercise within its territory the functions of a state, free from the interference of other states. However, as international trade increased and multi-jurisdictional disputes arose with greater frequency, the need for a legal doctrine to soften the absolutism of the doctrine of sovereignty became clear to jurists such as Ulrich Huber from as early as 1689: Chief Justice James Allsop, "Comity and Commerce" (2015) FedJSchol 27 at paras 22–24. Solutions were required for disputes that fell within the regulatory scope of more than one state. Comity was thus created as a legal tool to meet the political need to uphold the doctrine of sovereignty, and thereby protect the foundational pillar of the modern state system, while at the same time recognise the commercial and judicial need for the law to apply transnationally in certain circumstances: see Thomas Schultz & Jason Mitchenson, "Navigating sovereignty and transnational commercial

34

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

law: the use of comity by Australian courts" (2016) 12 Journal of Private
International Law 344 at 347.

76     The connection between sovereignty and comity featured in the High
Court case of *Ang Ming Chuang v Singapore Airlines Ltd (Civil Aeronautics
Administration, third party)* [2005] 1 SLR(R) 409 ("*Ang Ming Chuang*")
involving an application for the stay of a Singapore action on the grounds of
*forum non conveniens* and/or *lis alibi pendens*. Although *Ang Ming Chuang* was
strictly a case concerned with the determination of the governing law as a
relevant connecting factor under the *forum non conveniens* analysis, the
following remarks of La Forest J from the Canadian case of *Tolofson v Jensen*
[1994] 120 DLR (4th) 289, which were cited with approval by Woo Bih Li J (as
he then was), capture the essence of the connection between comity and the
concept of sovereignty:

> On the international plane, the relevant underlying reality is the
> territorial limits of law under the international legal order. *The
> underlying postulate of public international law is that generally
> each state has jurisdiction to make and apply law within its
> territorial limit*. Absent a breach of some overriding norm, other
> states as a matter of "comity" will ordinarily respect such
> actions and are hesitant to interfere with what another state
> chooses to do within those limits. Moreover, to accommodate
> the movement of people, wealth and skills across state lines, a
> by-product of modern civilization, *they will in great measure
> recognize the determination of legal issues in other states*. And
> to promote the same values, they will open their national
> forums for the resolution of specific legal disputes arising in
> other jurisdictions consistent with the interests and internal
> values of the forum state. These are the realities that must be
> reflected and accommodated in private international law.

> [emphasis added]

77     La Forest J's remarks show that each state possesses its own jurisdiction
to make and apply laws within its territorial limits, a prerogative with which
other states refrain from interfering in accordance with considerations of

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

comity. The remarks reflect two perspectives on how sovereignty factors into comity. On one hand, it is the sovereignty of *foreign* states which is the basis on which their actions are to be respected. On the other hand, comity also serves to protect the sovereignty of states from a *domestic* perspective. For courts tasked with determining whether, and to what extent, it would be appropriate to recognize the laws or power of a foreign state within their jurisdiction, comity calls for recognition where there is a judicial need to do so unless it would offend *domestic* sovereignty: Thomas Schultz & Jason Mitchenson, "Rediscovering the Principle of Comity in English Private International Law" (2018) 3 Europe Review of Private Law 311 at para 11. This perspective focuses on the role of *domestic* sovereignty, or in other words, the local forum, which is the Singapore courts in the present case, as opposed to a *foreign* state.

78     The importance of having regard to domestic sovereignty is seen from our earlier observation in *Merck* (in the context of defining the limits to transnational issue estoppel) that while the notion of comity would seem to support taking a more liberal approach in giving effect to foreign judicial determinations, the recognising court's constitutional role pulls in the opposite direction given the possibility of error in a foreign judicial determination and the reality that the rule of law is not always understood and applied consistently across jurisdictions. Therefore, there is no question that comity must be balanced against the court's role in protecting its domestic legal regime: see *Merck* at [52]. We made a similar observation in *BCS Business Consulting Services Pte Ltd and others v Baker, Michael A (executor of the estate of Chantal Burnison, deceased)* [2023] 1 SLR 1 in the context of our finding that the Singapore International Commercial Court rightly granted an anti-suit injunction against BCS for its pursuit of the Californian proceedings which

36

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

amounted to an abuse of the Singapore court's processes and/or were vexatious and oppressive. There, we stated (at [86]):

> 86    The fact that the claim in judicial estoppel engages issues of US public policy (and that it would therefore militate against comity to grant an ASI) is also not determinative. *While considerations of comity do weigh in the court's determination of whether the injunction should be granted and requires that the jurisdiction be exercised with caution (Lakshmi ([33] supra) at [108]), the principle of comity must be weighed against the affront to the integrity of the forum court's processes, jurisdiction and judgments.* As observed by this court in *Beckkett (HC)* ([69] *supra*) at [45]–[46] and *Beckkett (CA)* at [24], arguments on comity do not assist a plaintiff who commences a "duplicate law suit" in a foreign jurisdiction after a judgment has been handed down, and continues that foreign action even after an appeal on the judgment has been concluded. In that situation, it is the plaintiff's own acts which has placed both courts in an "unhappy position in so far as comity [is] concerned".
>
> [emphasis added]

79    The upshot of the discussion on the connection between comity and concerns of sovereignty from a domestic perspective is that considerations of comity must be balanced against the concerns of the local forum in upholding its constitutional role to oversee the administration of justice and safeguarding the rule of law within its jurisdiction. Indeed, Justice James Edelman and Madeleine Salinger have advanced the view that comity should be viewed as a principle based upon the implied *consent* of the sovereign: James Edelman and Madeleine Salinger, "Comity in Private International Law and Fundamental Principles of Justice" in Ch 13, Andrew Dickinson, Edwin Peel & Thomas Pausey, *A Conflict of Laws Companion* (Oxford University Press, 2021) ("*Edelman and Salinger*") at p 325. As such, a court would not recognise or enforce a foreign sovereign act where to do so would undermine the operation of the laws of the forum state: *Edelman and Salinger* at p 329. In this connection, it would be against public policy to recognise or enforce a foreign judgment on the application of a party, who having notice of an anti-suit

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

injunction from the court of the forum, proceeds to carry on with the foreign proceedings and subsequently procures the judgment from the foreign court: *WSG Nimbus Pte Ltd v Board of Control for Cricket in Sri Lanka* [2002] 1 SLR(R) 1088 at [65]. According to *Halsbury's Laws of Singapore* vol 6(2) (LexisNexis, 2020 Reissue) at para 75.274, this reflects the broader principle that this would be against the fundamental public policy of the forum stemming from the abuse of process which would result from the contempt of an order of the court of the forum.

80      In our view, the above principles were at play in the present case. Here, the appellant sought to invoke considerations of comity by relying on a foreign judgment which *post-dated*, and were in breach of, our earlier decision in *Oro Negro (CA)* that restored the Interim Injunctions. We were not persuaded by the appellant's submission that comity nonetheless became a central consideration because the Mexican Courts have, since our decision in *Oro Negro (CA)*, had the opportunity to consider Art 115A and have ruled that despite the appellant's ostensible breach, the *Oro Concursos* were valid. According to the Mexican decisions, this was because the operation of Art 115A contravened the law and public policy of Mexico. We disagreed that these Mexican decisions meant that comity considerations would have thus resurfaced to the fore. There was no doubt that the Mexican decisions have been procured in breach of the Interim Injunctions which this Court had previously restored in *Oro Negro (CA)*. We were unpersuaded by the appellant's position that the appellant had not been instructing the Guerra Lawyers in maintaining the proceedings in Mexico. As we highlighted to Mr Seah at the oral hearing before us, this argument was simply untenable when it was the appellant himself who had signed the Guerra POAs. In these circumstances, the breach of Art 115A was continuing and the Mexican decisions were granted notwithstanding the binding nature of the

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

Interim Injunctions, we saw no good reason why the permanent injunction should not be granted given the continuing breach. To deny the respondents permanent injunctive relief would indeed have been tantamount to not giving effect to the previously ordered Interim Injunctions. This would effectively have in turn extended recognition to the Mexican decisions which were procured in breach of the Interim Injunctions. Thus, even though the Interim Injunctions restored by this Court's decision in *Oro Negro (CA)* did not amount to anti-suit injunctions (see *Oro Negro (CA)* at [2]), the appellant's breach of the Interim Injunctions would nonetheless be captured by the broader principle as articulated above and would not be sanctioned by this court. Accordingly, judicial comity could not be applied at the expense of the court's role to protect its jurisdiction and orders.

81     For the reasons above, we were not persuaded that the injunctive relief sought in OS 126 gave rise to considerations of comity.

### There was no identity of issues between OS 126 and the Oro Concursos

82     We turn next to address the appellant's remaining arguments against final relief which are premised on his submission that the Mexican decisions, having decided on identical issues as that decided in OS 126, had given rise to issues of transnational issue estoppel, abuse of process and *res judicata*. As we observed above at [55], these arguments were predicated on the fundamental plank that there was an identity of issues between OS 126 and the *Oro Concursos*. Bearing in mind that this was the crux of the issue before us, we examine in closer detail the requirement of identity of issues.

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

*The requirement of identity of issues*

83     The requirement of identity of issues requires that "identical" issues are presented in both the earlier proceeding and the later proceeding sought to be impugned: Adrian Zuckerman, *Zuckerman on Civil Procedure: Principles of Practice* (Sweet & Maxwell, 4th Ed, 2021) at para 26.154; Peter Barnett, *Res Judicata, Estoppel, and Foreign Judgments* (Oxford University Press, 2001) ("*Res Judicata, Estoppel, and Foreign Judgments*") at para 5.100, citing *Turner v London Transport Executive* [1977] ICR 952 at p 964. The issues had to be identical in the sense that the prior decision must have traversed the same ground as the subsequent proceeding, and the facts and circumstances giving rise to the earlier decision must not have changed or were incapable of change: *Goh Nellie v Goh Lian Teck and others* [2007] 1 SLR(R) 453 at [34]. The burden of proof lies on the party seeking to rely on the preclusive effect of the prior decision: *Carl Zeiss Stiftung v Rayner & Keeler Ltd (No 2)* [1967] 1 AC 853 ("*Carl Zeiss (No 2)*") at 919.

84     Lord Wilberforce in *Carl Zeiss (No 2)* (at 965) provides further guidance that in determining what was the issue decided in a prior proceeding, "it is permissible to look not merely at the record of the judgment relied on, but at the reasons for it, the pleadings, the evidence … and if necessary other materials to show what was the issue decided." In approaching the meaning and effect of the decisions of a foreign court, there is a need for caution: *Westfal-Larsen And Co. A/S v Ikerigi Compania Naviera S.A, The Messiniaki Bergen* [1983] 1 All ER 382 at 383; *Res Judicata, Estoppel, and Foreign Judgments* at para 5.73. Thus, special caution applies to the proper framing of the issues decided by a foreign court. This, in turn, warrants caution in a court's consideration of the operation of preclusive pleas such as abuse of process (and issue estoppel) upon foreign judgments: see *Res Judicata, Estoppel, and Foreign Judgments* at para 1.54.

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*  [2024] SGCA 9

*The significance of different laws in competing jurisdictions*

85    The complication in the present case arises from the fact that we are dealing with a series of decisions by a *foreign* court, *ie,* the Mexican courts. This raises the question of whether the requirement of a "same issue" mandates that the "same question *of law"* must be involved. This question arises because one can reasonably ask whether an issue of law can ever be identical if it has been determined with reference to foreign law that is materially different from local law. An academic exploration of this question can be found in the following discussion by Barnett in *Res Judicata, Estoppel, and Foreign Judgments* at paras 5.108–5.111:

> However, some thought needs to be given to the meaning of 'same issue' when an issue of law is involved. Does it imply that *the same question of law* must be involved? If so: Can an issue of law *ever* be identical if it has been determined by a foreign law that must necessarily be different from the English law?
>
> ...
>
> Perhaps, too, this is the problem which Diplock LJ was trying to anticipate when he drew a distinction between 'issue estoppel' and 'fact estoppel'. In *Carl Zeiss (No 2)* both Lord Upjohn and Lord Wilberforce thought Diplock LJ's distinction did not apply to the facts of the case, although the latter thought it may deserve some further exploration. However, Lord Reid made the following observation which is perhaps useful for present purposes:
>
>> [Diplock LJ in the cases cited] draws a distinction between issue estoppel and fact estoppel which I find difficult to understand. Suppose that as an essential step towards the judgment in an earlier case it was decided (a) that on a particular date A owed B £100 or (b) that on that date A was alive. The first is, or at least probably, is, a question of law, the second is a pure question of fact. Are these findings to be treated differently when issue estoppel is pleaded in a later case? Or take marriage—an issue in the earlier case may have been whether the ceremony created a marriage (a question of law). I cannot think that this would make any difference if in a later case about quite different

> subject-matter the earlier finding for or against marriage was pleaded as creating issue estoppel.
>
> Thus the suggestion here, it seems, is that an 'issue of law' issue estoppel may well be effective for preclusive purposes even though the issue of law would be subject to a different legal treatment in the subsequent proceedings; or, indeed, that an 'issue of law' issue estoppel is to be treated just like any other issue estoppel. ***In which case the key thing is whether the relevant findings and questions are the same; or, as Lord Upjohn's speech seems to suggest: whether the facts, circumstances and arguments would be the same.***
>
> [emphasis in original in italics; emphasis added in bold italics]

86     Thus, according to Barnett, when faced with the question of determining the identity of issues where a foreign court's decision involves a point of foreign law, the approach to be taken is to ask, "whether the relevant findings and questions are the same" or "whether the facts, circumstances and arguments would be the same." However, this discussion throws no direct answers to the fundamental question of whether the requirement of a "same issue" entails that the "same question *of law"* must be involved. Prior to the hearing, we invited the parties to address the court on this issue. In this regard, we find the decision of the UK Supreme Court in *Kabab-Ji SAL (Lebanon) v Kout Food Group (Kuwait)* [2021] UKSC 48 ("*Kabab-Ji*") instructive for the proposition that where a foreign court is called upon to decide on issues based on its own laws, no identity of issues arises. *Kabab-Ji* concerned the court's assessment of the correctness of the trial judge's decision to adjourn any further hearing of the claimant's application pending the decision of the Paris Court of Appeal, the court of the seat of the arbitration, to set aside the arbitral award. The trial judge's decision to adjourn further hearings had been overturned by the English Court of Appeal. On appeal to the UK Supreme Court, the claimant submitted (at [86]) that the trial judge's decision ought to be upheld as the French court was the court of the seat of the arbitration, it was thus the court of supervisory jurisdiction and that it was desirable to avoid the risk of inconsistent decisions.

In rejecting this argument, the UK Supreme Court held that while it was indeed true that an adjournment would have been sensible if the grounds relied on for resisting enforcement of the award before the UK courts and the grounds to set aside the award before the court of the seat, France, were governed by the same law, *ie*, French law. Such matters of foreign law should best be left to a foreign court. However, the UK Supreme Court found that this consideration did not apply to justify the grant of an adjournment because the law which the English courts were called to apply was strictly English law. Thus, the court observed (at [87]) that "if the court of the seat was to apply its own law then it would be addressing a *different* issue, so that there could be no issue estoppel" [emphasis added].

87     In *Kabab-Ji*, the UK Supreme Court examined the question of identity of issues at two levels. First, whether the issues as framed before the two competing courts have been framed in the same manner. If the answer is yes, it remains necessary to examine the second and next level: whether the legal issues, albeit the same or substantially similar, arose from different laws of the competing jurisdictions. If yes, it would not give rise to issue estoppel as in *Kabab-ji*. The differences in the two laws must relate to substance and not just form.

88     The observations in *Kabab-Ji* can be illustrated with reference to *Yukos Capital Sarl v OJSC Rosneft Oil Co (No 2)* [2014] QB 458 ("*Yukos Capital*") at [150]–[151] and [156]. In *Yukos Capital*, an issue arose as to whether Rosneft was estopped under the doctrine of foreign issue estoppel from objecting to the enforcement of the awards in England given that the Amsterdam Court of Appeal had decided that the "Russian civil court judgments setting aside the arbitral awards are the result of an administration of justice which is to be qualified as partial and dependent, that it is not possible to recognise those

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

judgments in The Netherlands." (at [144]). There, counsel for Rosneft submitted that there was no identity of issue. According to counsel (at [149]), the issue to be decided by the English court was not the same issue as that decided by the Amsterdam Court of Appeal inasmuch as the Dutch decision was a decision to allow enforcement of the awards and refuse recognition of the annulment decision as a matter of Dutch public order, whereas the decision sought from the English courts was a decision that the Russian courts (whether generally or in this particular case) were partial and dependent on the executive and that their decision should not be recognised as a matter of the public order of England.

89    The English Court of Appeal in *Yukos Capital* found that the Amsterdam Court of Appeal's decision did not raise an issue estoppel as there was no identity of issues (at [150], [151] and [156]). It reasoned as follows:

> *Same issue?*
>
> 150. The issue in the Dutch proceedings was whether the annulment decisions setting aside the arbitral awards were "partial and dependent"; if they were, then they were not to be recognised by the Dutch courts. Mr Pollock for Yukos Capital submitted that the issue in the English proceedings is exactly the same since, if the decisions were "partial and dependent", the English courts will not recognise them. It is true that the Dutch courts treat the decision as one of Dutch public order and the English courts will treat it as a matter of English public order. But the public policy, submitted Mr Pollock, is the same in each country and the issue to be decided in accordance with that public policy is identical.
>
> 151. The difficulty with Mr Pollock's submission is that "public order" or "public policy" is inevitably different in each country. *The standards by which any particular country resolves the question whether the courts of another country are "partial and dependent" may vary considerably and it is also a matter of high policy to determine the circumstances in which this country should recognise the judgments of a state where the interests of that very state are at stake.* Normally such recognition will be given and, if it is to be refused, cogent evidence of partiality and dependency will be required. *Our own law is (or may be) that*

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

> *considerations of comity necessitate specific examples of partiality and dependency before any decision is made not to recognise the judgments of a foreign state. It is our own public order which defines the framework of any assessment of this difficult question; whether such decisions are truly to be regarded as dependent and partial as a matter of English law is not the same question as whether such decisions are to be regarded as dependent and partial in the view of some other court according to that court's notions of what is acceptable or otherwise according to its law.*

> ...

> 156. It was put to the judge that the issue decided in Holland was that the Russian judgments should not be recognised as a matter of Dutch public order and that that was not the same issue as had to be decided in England. The judge's response in para 94 was:

> > "the finding that the annulment decisions were the result of a partial and dependent legal process was both necessary and fundamental to the decision. That the Amsterdam Court of Appeal determined that issue in the context of a different legal question (i.e. by reference to Dutch public order) makes no difference."

> We cannot, with respect, agree because, for the reasons given, it makes a great deal of difference whether the issue is being determined by reference to Dutch public order or English public order which is (or may well be) different. The point is that English public order is as explained by Lord Collins JSC in the *Altimo Holdings* case and the English court must determine the matter by reference to those considerations not by whatever considerations make up Dutch public order.

> [emphasis added]

90    Based on the observations of the English Court of Appeal in *Yukos Capital* above, even where both the English court and a foreign court were engaged on the *same* issue at a broad level of abstraction (*ie*, whether the annulment decisions setting aside the arbitral awards were "partial and dependent"), there would nonetheless be no identity of issues where these issues were ultimately governed by *different* laws (*ie*, the manifestation of what is

meant by "partial and dependence" that is unique to the public policy of each legal system). Indeed, this Court made a similar point in its recent decision in *Deutsche Telekom* ([70] *supra*) at [86]:

> 86      In our judgment, no question of issue estoppel can arise where the public policy of the enforcement court's jurisdiction is in issue (or for that matter, the arbitrability of a dispute, which is a question that is determined by reference to the enforcement court's public policy: *Anupam Mittal v Westbridge Ventures II Investment Holdings* [2023] 1 SLR 349 at [48]; *Diag Human* at [58]; New Delhi Address at para 34) because the question of what that public policy is or requires will not have been previously considered by the seat court. There would be no identity of subject matter in such a situation because domestic public policy is unique to each State (*BAZ v BBA* ([76] *supra*) at [50]).

91      Turning back to the facts of the present case, we note that the appellant had framed the issues raised in the Mexico proceedings at a broad level of abstraction in submitting that the Judge erred in rejecting a finding that the Mexican decisions raised the same issues because OS 126 concerned matters of Singapore law while the Mexican decisions concerned matters of Mexican law and public policy. According to the appellant, the fact that OS 126 did not purport to decide issues of Mexican law or public policy did not mean there was no "conflicting impact and effect" on the Mexican decisions based on Mexican law or public policy. The appellant sought to focus on the *consequences* of the decisions in the *Oro Concursos* in his attempt to draw some similarity with OS 126. However, this approach was erroneous. The question was not whether there is an identity of *consequences* between the decisions of the two competing jurisdictions. Rather, the question was whether there is an identity of *issues* between them.

92      The present case disclosed no identity of issues on either of the two levels of analysis as suggested in *Kabab-Ji*. At the first level, the issues as

framed before the two competing courts were clearly different. The issues in OS 126 concerned: (a) whether the appellant breached his implied contract with the respondents which incorporates as a term the substance of Art 115A; (b) whether Integradora induced the appellant to breach that contract; and (c) whether the corporate acts which the respondents undertook in light of the event of default were valid. On the other hand, the issues before the Mexican courts in the *Oro Concursos* concerned whether the Mexican courts were entitled or obliged, under Art 87 of the LCM and Mexican public policy: (a) to disapply Art 115A in deciding whether to admit the *Oro Concursos*; and (b) to disregard cl 15.1(g) of the bond agreement in determining the consequences of the event of default.

93     On the second level, the dissimilarity of the issues was further reinforced by the differences in the applicable laws to the questions stated above. Taking the appellant's case at its highest, even if the issues as framed at the first level were the same, they would be governed by different laws such that there would in any case, be no identity of issues for the operation of the doctrines of abuse of process or transnational issue estoppel. Thus, we agreed with the Judge's observations at [155] of the GD where he held that "[d]espite the [the appellant's] attempts to frame the issues in the consolidated *concursos* in terms which appear superficially identical to the issues on this originating summons, the two proceedings in [his] view raise very different issues". While Art 115A featured in both OS 126 and the *Oro Concursos*, that was where the commonality ended. The issues raised in both jurisdictions were quite different. Before the Mexican courts, the issue concerned the constitutionality of Art 115A under Mexican law, *ie*, Art 87 of the LCM. In contrast, the issue in OS 126 concerned the breach of Art 115A and the relief to be granted in response to that breach under Singapore law. There can be no serious dispute

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

that the two courts did not purport to deal with the same issue which was before the other court.

94     For completeness, we address three others points raised by the appellant in the course of its submissions that the reliefs sought in OS 126 constituted an abuse of process.

95     First, we note that the appellant shifted tack in its submissions on appeal to argue that there is a similarity between the "relief *granted* in OS 126 (emphasis added)" (as opposed to the relief sought in OS 126) and the "relief sought in the Mexico proceedings". In this regard, the appellant contended that the relief *granted* in OS 126 was in effect the same prayers sought by the respondents in the Mexico proceedings. In our view, this argument was a non-starter. The decision of the court itself to grant the relief sought by the respondents on its own varied terms cannot be an abuse of the court's *own* processes. To countenance this argument would mean that a court can abuse its own process in framing the appropriate relief to be granted.

96     Second, the appellant further submitted that the Judge had erred in viewing the causes of action sought by the respondents in isolation of the respondents' intents and motives in commencing OS 126 because this would be relevant in deciding whether OS 126 is an abuse of process. We emphasize that it must not be overlooked that the court's role is to prevent abuse of its *own* process. Once this is properly appreciated, the "motive" as to how and where a successful party intends to use a judgment of the court cannot render the invocation of that same court's jurisdiction, if it was otherwise proper, an improper or an abuse of process. In the present context, the respondents' purported "intent and motives" as to how they would utilize the final judgment procured in their favour in OS 126 in another jurisdiction was irrelevant. There

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*          [2024] SGCA 9

was nothing improper for the respondents, as Singapore-incorporated companies, to seek relief in OS 126 for a breach of the companies' articles of association. Naturally, given that the rigs were based in Mexico, it was to be expected that the respondents may take steps in other jurisdictions to give effect to the injunction including Mexico. This could not conceivably render the otherwise proper invocation of the court's jurisdiction in OS 126 to obtain the injunction an abuse of the process of the Singapore courts.

97     Third, in assessing whether there was an abuse of the process of the Singapore courts, we also did not consider that the present case disclosed an abuse of process under the rule in *Henderson v Henderson* (1843) 3 Hare 100 ("*Henderson*"). The respondents simply could not have raised the points dealt with in OS 126 before the Mexican courts once the Mexican courts have decided that Art 115A would not be given effect in Mexico.

98     Quite apart from the three points considered above, given our finding that there was no identity of issues, this would have sufficed to dispose of the appellant's four primary contentions on appeal, *viz*, abuse of process, *res judicata*, breach of comity and the futility of the permanent injunctions.

### Observations on the requirement of identity of parties where insolvency proceedings are involved

99     Before concluding, we make the following observations regarding the Judge's finding that a modified approach should be taken for insolvency proceedings in determining whether there is an identity of parties for the abuse of process analysis (GD at [141]). The Judge expressed the modified test in the following terms: in determining the requirement of identity of parties in insolvency proceedings, the court should look for a person over whom the insolvency court exercised jurisdiction in entering judgment or in making an

49

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

order rather than for a "party" as that concept has developed as a matter of civil procedure (GD at [149]). According to the Judge, this modified approach is warranted because insolvency proceedings differ substantially from civil proceedings. As civil proceedings are founded on a *lis*, it is easy to identify the parties to such proceedings as the legal persons listed in the title of such proceedings (GD at [139] and [141]–[142]). However, the same cannot be said of insolvency proceedings where the objective of such proceedings is the procurement of a judgment effecting a fundamental change in the debtor's status for the collective benefit of all those who have an interest in its estate. Thus, a judgment in these proceedings differs from a judgment in civil proceedings in that the change of status effected by the judgment binds the whole world; it does not bind only those who are parties to the proceedings as a matter of civil procedure (GD at [144]).

100    In our view, there was no necessity for the Judge to have propounded a modified approach in determining whether there is an identity of parties where insolvency proceedings are involved. We make two points. This approach may represent a step too far in extending the existing common law approach to the requirement of identity of parties. Furthermore, we did not consider the extension of the applicable test for the identity of parties to have been even necessary in assessing whether an abuse of process was made out.

101    In deciding who can benefit from the preclusionary effect of a prior judgment via doctrines such as abuse of process or transnational issue estoppel, it has always been the approach of the common law to draw a distinction between judgments *in personam* and judgments *in rem*. Judgments *in personam* determine the rights and liabilities of parties *inter se* such that only parties or privies to such judgements *in personam* can benefit from their preclusionary effect. In contrast, judgments *in rem* involve the determination of the status of

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

a person or thing and thus operate conclusively against the whole world: *Res Judicata, Estoppel, and Foreign Judgments* at para 3.02.

102    In propounding a modified test for insolvency proceedings, the Judge effectively created a *third* category of judicial decisions, apart from judgments *in personam* and judgments *in rem*, which require distinct treatment in terms of their preclusionary effect. This is implied by the Judge's attempt to distinguish between insolvency proceedings and "civil proceedings" (which he states at [142] involves the "vindicat[ion] [of] a personal or proprietary private right", *ie*, judgments *in personam* and *in rem*, respectively). Respectfully, this would represent a sea change in the law. We note that the Judge did not refer to any authorities for his extension of the requirement of identity of parties.

103    There has been some suggestion from the English Court of Appeal in *Rubin and another v Eurofinance SA and others* [2011] 2 WLR 121, in the context of the applicable requirements for the recognition and enforcement of foreign judgments, that judgments rendered in insolvency proceedings were not subject to the normal common law recognition and enforcement of foreign judgment rules but were to be governed by *sui generis* private international law rules. One commentator has stated this to represent the creation of "a third category of foreign judgments" where "in addition to judgments *in personam* and judgments *in rem*, there was to be a separate category of judgments in insolvency proceedings with its own rules for the recognition and enforcement thereof.": Adeline Chong, "Recognition of foreign judgments and cross-border insolvencies" (2014) 2 Lloyd's Maritime and Commercial Law Quarterly 241 at p 243. In reaching this conclusion, the English Court of Appeal had drawn on, among others, a decision of the Privy Council in *Cambridge Gas Transport Corp v Navigator Holdings* [2007] 1 AC 508 ("*Cambridge Gas*"). According to the learned authors of *Spencer Bower and Handley: Res Judicata* (Butterworths,

4th Ed, 2009) ("*Spencer Bower and Handley*") at para 9.02, the Privy Council had in *Cambridge Gas* recognised a third category of judgments in bankruptcy and insolvency proceedings. In that case, the debtor, Navigator Holdings, was incorporated in the Isle of Man and owned shares in another Manx company, which owned the shares in five single-vessel Manx companies. The appellant in that case, incorporated in the Cayman Islands, owned at least 70% of the shares in the debtor. The debtor applied to the Bankruptcy Court of the Southern District of New York for a Chapter 11 reorganisation. The court approved the creditors' plan to vest the shares in the debtor, but not its assets, in their committee. The New York bankruptcy court sent a letter of request to the Manx court seeking its assistance in vesting the shares in the committee. The appellant argued that the New York bankruptcy court order was not *in rem* because the shares were not situated in New York, and it was not bound *in personam* because it had not submitted to the jurisdiction. In sidestepping this argument, Lord Hoffmann found that the New York bankruptcy court order was neither *in personam* nor *in rem*. Instead, Lord Hoffman was of the view that bankruptcy and insolvency proceedings represent a separate category of judicial decisions based on the following reasoning (*Cambridge Gas* at [13]–[15]):

> Judgments *in rem* and *in personam* are judicial determinations of the existence of rights: in the one case, rights over property and in the other, rights against a person. ...
>
> ... The purpose of bankruptcy proceedings, on the other hand, is not to determine or establish the existence of rights, but to provide a mechanism of collective execution against the property of the debtor by creditors whose rights are admitted or established. ...
>
> ... The important point is that bankruptcy, whether personal or corporate, is a collective proceeding to enforce rights and not to establish them. ...

104    This extension of the law by the Court of Appeal in reliance on Lord Hoffman's observations in *Cambridge Gas*, however, was overturned on appeal

by the UK Supreme Court as it "would not be an incremental development of existing principles, but a radical departure from substantially settled law": *Rubin v Eurofinance* [2013] BCC 1 ("*Rubin (UKSC)*") at 31. Three of their Lordships in *Rubin (UKSC)* were of the view that *Cambridge Gas* had been wrongly decided, with Lord Collins observing (at 27) that the New York court order was in reality, an "*in rem* order in relation to property in the Isle of Man in the sense of deciding the status of a thing and purporting to bind the world".

105    Addressing the implications of *Cambridge Gas* to the more specific context of the preclusionary effect of foreign judgements for the purposes of the *res judicata* and/or abuse of process analysis, the authors of *Spencer Bower and Handley* at para 9.04 criticise *Cambridge Gas* on the basis that the Privy Council could have decided that case on the basis that the New York bankruptcy court order operated as a judgment *in personam*:

> The fact that proceedings enforce the collective rights of creditors is an inadequate reason for holding that a judgment is not *in personam*. The claimant enforces the rights of a class, and all creditors are bound by, and entitled to the benefit of the judgment. Nor is it apparent why proceedings to enforce a collective execution against the property of a debtor are not proceedings to establish rights merely because the debts do not merge in the order for bankruptcy or winding up. An execution for the benefit of the claimant appears to be *in personam*. Lord Hoffmann relied on *Solomons v Ross* to support the universal operation of such orders without noticing that it had been overruled in *Galbraith v Grimshaw and Baxter*. There were at least two grounds for holding that the New York judgment was binding on Cambridge *in personam*. Although there were concurrent findings that it had not submitted to the jurisdiction it was aware, through its parent and directors, of the proceedings and could have intervened, but allowed the proceedings to be conducted by its parent in the same interest, and was there a deemed party. As a 70% owner of the debtor it was also bound as a privy of its subsidiary and its own parent which participated in the Chapter 11 proceedings.

106     From the foregoing discussion, we were of the view that the recognition of a modified approach with respect to insolvency proceedings would represent more than an incremental development in the law.

107     In any case, we harboured doubts that an expansion to the test for the identity of parties was even necessary in the present case to assess whether OS 126 amounted to an abuse of process. In the first place, the fact that the parties may not have been the same in two competing proceedings would not bar a plea of abuse of process since the circumstances may be such as to nonetheless bring the case within "the spirit of the rules": see *Beh Chew Boo v Public Prosecutor* [2021] 2 SLR 180 at [72(4)]. As George Wei J explained in *Antariksa Logistics Pte Ltd and others v Nurdian Cuaca and others* [2018] 3 SLR 117 at [74], the doctrine of abuse of process is not limited to re-litigation between the *same* parties. In other words, it was not necessary for the defendant in the later proceedings to have been a party to the earlier suit before the doctrine could apply. The non-essentiality of any requirement of identity of parties for the abuse of process analysis meant that it was not strictly necessary for the Judge to have decided on any expanded approach for insolvency proceedings.

108     This conclusion is reinforced by this Court's decision in *Lim Geok Lin Andy v Yap Jin Meng Bryan and another appeal* [2017] 2 SLR 760 at [44], where we held that what matters for the purposes of invoking the abuse of process doctrine in *Henderson* is that there exists "some connection" between the party seeking to relitigate the issue and the earlier proceeding where that essential issue was litigated, which would make it unjust to allow that party to reopen the issue. There is no reason in principle why the rule in *Henderson* ought to be confined only to repeated claims by the same respondent or to repeated claims against the same defendant. Thus, the proper inquiry here should have been whether there was some *connection* between the respondents,

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

as the party which the appellant claims to be relitigating issues earlier decided, and the *Oro Concursos*. In this connection, given the Judge's finding that the *Oro Concursos* may be taken to be a single consolidated *concurso* involving Integradora, Perforadora and all the respondents (GD at [138]), there was clearly a *connection* between the respondents – which were parties to the *Oro Concursos* – and the *Oro Concursos* to justify the invocation of the abuse of process doctrine. The parties did not raise any challenge to the Judge's finding in this respect, and we saw no reason to disturb this finding.

### The purported futility of relief

109    Finally, we address the appellant's submission that the injunctive relief sought in OS 126 would have been futile especially in light of the Judge's observation at [206] of the GD that none of the relief granted touched on the status of the Guerra Lawyers as the agents or otherwise of the respondents under the Guerra POAs of August 2017 as a matter of Mexican law and public policy.

110    It is often said that "equity does not act in vain": see *Attorney-General v Guardian Newspapers Ltd* [1987] 3 All ER 316 ("*Guardian Newspapers*") at 332. In withholding relief based on futility, there appear to be two possible explanations. First, it would be a waste of the court's resources. In fashioning relief, courts are entitled to take considerations of judicial economy into account. As noted by one commentator, the main purpose of denying futile relief on an economic basis appears to lie in its pre-emptive educative effect where if potential litigants know that futile orders will be denied, they can be expected to refrain from applying for such relief: Normann Witzleb, "'Equity Does Not Act in Vain': An Analysis of Futility Arguments in Claims for Injunctions" (2010) 32(3) Sydney Law Review 503 ("*Equity Does Not Act in Vain*") at 507. A second possible rationale for denying relief lies in the fact that futile orders

may undermine confidence in the courts: *Equity Does Not Act in Vain* at p 507. In his article, Witzleb refers to the case of *Guardian Newspapers* as an illustration of a situation where futility appears to have featured in the court's decision to deny injunctive relief. In response to a prayer to maintain an injunction against newspapers proposing to publish government secrets after the information had become widely available through a book publication overseas, Lord Bridge pointed out that such a decision would be likely "to give rise to a degree of lack of respect for the court" if it was "seeking to achieve the unachievable" (at 347).

111    Whatever may be the basis for the court's refusal of relief on the grounds of futility, we were unable to see any force in the argument that injunctive relief should be withheld merely because there was a distinct possibility that another court might not give effect to it. In this connection, we found the case of *Re Liddell's Settlement Trust* [1936] Ch 365 at 374 instructive. In rejecting an argument that the court should not have made an order against a mother requiring the return of her children because it would have been unenforceable against the mother who remained outside the jurisdiction, Romer LJ observed (at 374): "It is not the habit of this court in considering whether it will make an order to contemplate the possibility that it will be disobeyed." This was precisely the situation here. In the present case, the relief in OS 126 was ultimately granted to restrain breaches of *Singapore* law, a role which is squarely within the remit and constitutional duty of the Singapore courts. Whether a foreign court may choose to give or not to give effect to Singapore's orders was strictly irrelevant and should not operate to bar the granting of the relief.

*Gonzalo Gil White v Oro Negro Drilling Pte Ltd*                    [2024] SGCA 9

**Conclusion**

112    For the reasons above, we dismissed the appeal with costs awarded in favour of the respondents in the aggregate sum of $30,000 all-in. The usual consequential orders apply.

Sundaresh Menon
Chief Justice

Steven Chong
Justice of the Court of Appeal

Belinda Ang Saw Ean
Justice of the Court of Appeal

Seah Zhen Wei Paul, Siew Guo Wei, Grace Ho Jia Hui and Tyronne Toh Jia-En (Tan Kok Quan Partnership) for the appellant;
Ajaib Hari Dass, Ragini d/o Parasuram and Brian Larry Khoo (Haridass Ho & Partners) for the respondents.

———————————————

Certified True Copy

Manager, Judge's Chambers
Supreme Court Singapore

:09 AM                                                SAL Commissioners for Oaths & Notaries Public



NC0O0T0GDB

### NOTARIAL CERTIFICATE

TO ALL TO WHOM these presents shall come

I, Venkiteswaran Hariharan, NOTARY PUBLIC duly admitted, authorised to practise in the Republic of Singapore, DO HEREBY CERTIFY

that the annexed document is a true copy of the Order of Court issued by the Court of Appeal of the Republic of Singapore in Case No.: CA/CA 10/2023 issued on 22nd January 2024, which has been certified as a true copy by Joanne Leong in her capacity of Assistant Registrar of the Supreme Court of Singapore, on 26th January 2024.

IN FAITH AND TESTIMONY whereof I the said notary have subscribed my name and set and affixed my seal of office at Singapore, this 29th day of January 2024.



**NOTARY PUBLIC**
**SINGAPORE**



By virtue of Rule 8(3)(c) of the Notaries Public Rules, a Notarial Certificate must be authenticated by the Singapore Academy of Law in order to be valid.

With effect from 16 September 2021, a Notarial Certificate shall be deemed to be validly authenticated by the affixing of an Apostille to the back of the Notarial Certificate.

# APOSTILLE

(Convention de La Haye du 5 Octobre 1961)

This **Apostille** only certifies the authenticity of the signature, seal or stamp and the capacity of the person who has signed the attached Singapore public document, and, where appropriate, the identity of the seal or stamp. It does not certify the authenticity of the underlying document.

If this document is to be used in a country not party to the Hague Convention of the 5th of October 1961, it should be presented to the consular section of the mission representing that country.

To verify this **Apostille**, go to
https://legalisation.sal.sg
or scan QR code:



**Verification code: 89988034**

| | |
|---|---|
| 1. **Country:** | Singapore |
| **This public document** | |
| 2. **Has been signed by:** | Venkiteswaran Hariharan |
| 3. **Acting in the capacity of:** | Notary Public |
| 4. **Bears the seal/stamp of:** | Notary Public |
| **Certified** | |
| 5. **At:** | Singapore Academy of Law |
| 6. **The:** | 30th January 2024 |
| 7. **By:** | Melissa Goh, Director, Trust Services, SAL |
| 8. **No.:** | AC0O0U0ESI |
| 9. **Seal/Stamp:** | 10. **Signature:** |



**IN THE COURT OF APPEAL OF THE REPUBLIC OF SINGAPORE**

Case No.: CA/CA 10/2023

Doc No.: CA/ORC 5/2024
Filed: 22-January-2024 11:04 AM





Between

GONZALO GIL WHITE
(Mexico Passport No. G25499104)

...Appellant(s)

And

1.  ORO NEGRO DRILLING PTE. LTD.
    (Singapore UEN No. 201225610H)

2.  ORO NEGRO DECUS PTE. LTD.
    (Singapore UEN No. 201320204D)

3.  ORO NEGRO FORTIUS PTE. LTD.
    (Singapore UEN No. 201320197R)

4.  ORO NEGRO IMPETUS PTE. LTD.
    (Singapore UEN No. 201418924G)

5.  ORO NEGRO LAURUS PTE. LTD.
    (Singapore UEN No. 201225628H)

6.  ORO NEGRO PRIMUS PTE. LTD.
    (Singapore UEN No. 201225622D)

...Respondent(s)

In the matter of HC/OS 126/2018

In the matter of Section 39 and 409A of the Companies Act (Cap 50)

And

In the matter of Order 29 Rule 1 of the Rules of Court

Between

1.  ORO NEGRO DRILLING PTE. LTD.
    (Singapore UEN No. 201225610H)

2.  ORO NEGRO DECUS PTE. LTD.
    (Singapore UEN No. 201320204D)

3.  ORO NEGRO FORTIUS PTE. LTD.
    (Singapore UEN No. 201320197R)

4.  ORO NEGRO IMPETUS PTE. LTD.
    (Singapore UEN No. 201418924G)

5.  ORO NEGRO LAURUS PTE. LTD.
    (Singapore UEN No. 201225628H)

6.  ORO NEGRO PRIMUS PTE. LTD.
    (Singapore UEN No. 201225622D)

...Plaintiff(s)

And

1.  INTEGRADORA DE SERVICIOS
    PETROLEROS ORO NEGRO, S.A.P.I. DE C.V.
    (Mexico Registration No. 413253-1)

2.  ALONSO DEL VAL ECHEVERRIA

Certified True Copy

AR Joanne Leong
Supreme Court of Singapore
26 January 2024

(Mexico Passport No. G18367872)

3.  GONZALO GIL WHITE
    (Mexico Passport No. G03582848)

4.  JESUS ANGEL GUERRA MENDEZ
    (Mexico Passport No. G29235967)

5.  PATRICIO FABIAN HIDALGO ESTRADA
    (ID Unknown)

6.  OCTAVIO OCHOA HUERTA
    (ID Unknown)

7.  ELIAS MENDOZA MURGIA
    (ID Unknown)

...Defendant(s)

## ORDER OF COURT

| | |
|---|---|
| Case No: | CA/CA 10/2023 |
| Before: | The Honourable Chief Justice Sundaresh Menon, The Honourable Justice Steven Chong and The Honourable Justice Belinda Ang Saw Ean |
| Venue: | in Open Court |
| Hearing date/Time: | 17-January-2024 |

**UPON THE APPEAL** of the abovenamed Appellant in this action coming on for hearing this day and upon hearing counsel for the Appellant and counsel for the 1st to 6th Respondents,

It is ordered that:

1. The appeal against the decision of The Honourable Justice Vinodh Coomaraswamy in HC/ORC 1308/2023 given on 10th March 2023 be dismissed;

2. The costs of the appeal be fixed at S$30,000.00 (inclusive of disbursements) and be paid by the Appellant to the 1st to 6th Respondents forthwith; and

3. The sum of S$20,000.00 held by Messrs Tan Kok Quan Partnership, the solicitors for the Appellant, by way of security for the 1st to 6th Respondents' costs of the appeal pursuant to the Undertaking for Security for Costs dated 4th April 2023, be released to Haridass Ho & Partners, Solicitors for the 1st to 6th Respondents, as part payment of the costs order at paragraph 2 above.

Notes:
1. The person or entity served with this judgment/order and who/which has been ordered to pay money, to do or not to do any act must comply immediately or within the time specified in the judgment/order, if any.
2. Failure to comply may result in enforcement of judgment/order proceedings, including contempt of Court proceedings, against the said person or entity.

Certified True Copy

AR Joanne Leong
Supreme Court of Singapore
26 January 2024



*https://www.courtorders.gov.sg*
*Access code: 8medbfw4l*

Getting this document from the Authentic Court Orders
Portal verifies:
(a) that it was issued by the Courts of the Republic of
Singapore or, in the case of a Schedule of Assets, that it was
filed with the Courts in relation to an application for a Grant
of Probate/Letter of Administration; and (b) the text of the
document was issued on 17 Jan 2024



TAN BOON HENG
REGISTRAR
SUPREME COURT
SINGAPORE



Certified True Copy

AR Joanne Leong
Supreme Court of Singapore
26 January 2024

SAL Commissioners for Oaths & Notaries Public



NC0O0T0GCD

## NOTARIAL CERTIFICATE

TO ALL TO WHOM these presents shall come

I, Venkiteswaran Hariharan, NOTARY PUBLIC duly admitted, authorised to practise in the Republic of Singapore, DO HEREBY CERTIFY

that the  annexed document is a true copy of the Order of Court issued by the Court of Appeal of the Republic of Singapore in Case No.: CA/CA 10/2023 issued on 22nd January 2024, which has been certified as a true copy by Joanne Leong in her capacity of Assistant Registrar of the Supreme Court of Singapore, on 26th January 2024.

IN FAITH AND TESTIMONY whereof I the said notary have subscribed my name and set and affixed my seal of office at Singapore, this 29th day of January 2024.



**NOTARY PUBLIC**
**SINGAPORE**



**By virtue of Rule 8(3)(c) of the Notaries Public Rules, a Notarial Certificate must be authenticated by the Singapore Academy of Law in order to be valid.**

**With effect from 16 September 2021, a Notarial Certificate shall be deemed to be validly authenticated by the affixing of an Apostille to the back of the Notarial Certificate.**

# APOSTILLE

(Convention de La Haye du 5 Octobre 1961)

This **Apostille** only certifies the authenticity of the signature, seal or stamp and the capacity of the person who has signed the attached Singapore public document, and, where appropriate, the identity of the seal or stamp. It does not certify the authenticity of the underlying document.

If this document is to be used in a country not party to the Hague Convention of the 5th of October 1961, it should be presented to the consular section of the mission representing that country.

To verify this **Apostille**, go to
https://legalisation.sal.sg
or scan QR code:



**Verification code: 31711078**

| | |
|---|---|
| 1.  **Country:** | Singapore |
| **This public document** | |
| 2.  **Has been signed by:** | Venkiteswaran Hariharan |
| 3.  **Acting in the capacity of:** | Notary Public |
| 4.  **Bears the seal/stamp of:** | Notary Public |
| **Certified** | |
| 5.  **At:** | Singapore Academy of Law |
| 6.  **The:** | 30th January 2024 |
| 7.  **By:** | Melissa Goh, Director, Trust Services, SAL |
| 8.  **No.:** | AC0O0U0ETG |
| 9.  **Seal/Stamp:** | 10.  **Signature:** |

Melissa

## IN THE COURT OF APPEAL OF THE REPUBLIC OF SINGAPORE

Case No.: CA/CA 10/2023

Doc No.: CA/ORC 5/2024
Filed: 22-January-2024 11:04 AM



Between

GONZALO GIL WHITE
(Mexico Passport No. G25499104)

...Appellant(s)



And

1.  ORO NEGRO DRILLING PTE. LTD.
    (Singapore UEN No. 201225610H)

2.  ORO NEGRO DECUS PTE. LTD.
    (Singapore UEN No. 201320204D)

3.  ORO NEGRO FORTIUS PTE. LTD.
    (Singapore UEN No. 201320197R)

4.  ORO NEGRO IMPETUS PTE. LTD.
    (Singapore UEN No. 201418924G)

5.  ORO NEGRO LAURUS PTE. LTD.
    (Singapore UEN No. 201225628H)

6.  ORO NEGRO PRIMUS PTE. LTD.
    (Singapore UEN No. 201225622D)

...Respondent(s)

In the matter of HC/OS 126/2018

In the matter of Section 39 and 409A of the Companies Act (Cap 50)

And

In the matter of Order 29 Rule 1 of the Rules of Court

Between

1.  ORO NEGRO DRILLING PTE. LTD.
    (Singapore UEN No. 201225610H)

2.  ORO NEGRO DECUS PTE. LTD.
    (Singapore UEN No. 201320204D)

3.  ORO NEGRO FORTIUS PTE. LTD.
    (Singapore UEN No. 201320197R)

4.  ORO NEGRO IMPETUS PTE. LTD.
    (Singapore UEN No. 201418924G)

5.  ORO NEGRO LAURUS PTE. LTD.
    (Singapore UEN No. 201225628H)

6.  ORO NEGRO PRIMUS PTE. LTD.
    (Singapore UEN No. 201225622D)

...Plaintiff(s)

And

1.  INTEGRADORA DE SERVICIOS
    PETROLEROS ORO NEGRO, S.A.P.I. DE C.V.
    (Mexico Registration No. 413253-1)

2.  ALONSO DEL VAL ECHEVERRIA

Certified True Copy

*Joanne Leong*

AR Joanne Leong
Supreme Court of Singapore
26 January 2024

      (Mexico Passport No. G18367872)

3.    GONZALO GIL WHITE
       (Mexico Passport No. G03582848)

4.    JESUS ANGEL GUERRA MENDEZ
       (Mexico Passport No. G29235967)

5.    PATRICIO FABIAN HIDALGO ESTRADA
       (ID Unknown)

6.    OCTAVIO OCHOA HUERTA
       (ID Unknown)

7.    ELIAS MENDOZA MURGIA
       (ID Unknown)

                                           ...Defendant(s)

**ORDER OF COURT**



| | |
|---|---|
| Case No: | CA/CA 10/2023 |
| Before: | The Honourable Chief Justice Sundaresh Menon, The Honourable Justice Steven Chong and The Honourable Justice Belinda Ang Saw Ean |
| Venue: | in Open Court |
| Hearing date/Time: | 17-January-2024 |

**UPON THE APPEAL** of the abovenamed Appellant in this action coming on for hearing this day and upon hearing counsel for the Appellant and counsel for the 1st to 6th Respondents,

It is ordered that:

1. The appeal against the decision of The Honourable Justice Vinodh Coomaraswamy in HC/ORC 1308/2023 given on 10th March 2023 be dismissed;

2. The costs of the appeal be fixed at S$30,000.00 (inclusive of disbursements) and be paid by the Appellant to the 1st to 6th Respondents forthwith; and

3. The sum of S$20,000.00 held by Messrs Tan Kok Quan Partnership, the solicitors for the Appellant, by way of security for the 1st to 6th Respondents' costs of the appeal pursuant to the Undertaking for Security for Costs dated 4th April 2023, be released to Haridass Ho & Partners, Solicitors for the 1st to 6th Respondents, as part payment of the costs order at paragraph 2 above.

Notes:
1. The person or entity served with this judgment/order and who/which has been ordered to pay money, to do or not to do any act must comply immediately or within the time specified in the judgment/order, if any.
2. Failure to comply may result in enforcement of judgment/order proceedings, including contempt of Court proceedings, against the said person or entity.

Certified True Copy

AR Joanne Leong
Supreme Court of Singapore
26 January 2024





*https://www.courtorders.gov.sg*
*Access code: 8medbfw4l*

TAN BOON HENG
REGISTRAR
SUPREME COURT
SINGAPORE

Getting this document from the Authentic Court Orders
Portal verifies:
(a) that it was issued by the Courts of the Republic of
Singapore or, in the case of a Schedule of Assets, that it was
filed with the Courts in relation to an application for a Grant
of Probate/Letter of Administration; and (b) the text of the
document was issued on 17 Jan 2024



Certified True Copy

AR Joanne Leong
Supreme Court of Singapore
26 January 2024

/24, 11:09 AM                                        SAL Commissioners for Oaths & Notaries Public



NC0O0T0GBF

## NOTARIAL CERTIFICATE

TO ALL TO WHOM these presents shall come

I, Venkiteswaran Hariharan, NOTARY PUBLIC duly admitted, authorised to practise in the Republic of Singapore, DO HEREBY CERTIFY

that the  annexed document is a true copy of the Order of Court issued by the Court of Appeal of the Republic of Singapore in Case No.: CA/CA 10/2023 issued on 22nd January 2024, which has been certified as a true copy by Joanne Leong in her capacity of Assistant Registrar of the Supreme Court of Singapore, on 26th January 2024.

IN FAITH AND TESTIMONY whereof I the said notary have subscribed my name and set and affixed my seal of office at Singapore, this 29th day of January 2024.



**NOTARY PUBLIC
SINGAPORE**



By virtue of Rule 8(3)(c) of the Notaries Public Rules, a Notarial Certificate must be authenticated by the Singapore Academy of Law in order to be valid.

With effect from 16 September 2021, a Notarial Certificate shall be deemed to be validly authenticated by the affixing of an Apostille to the back of the Notarial Certificate.

# APOSTILLE

(Convention de La Haye du 5 Octobre 1961)

This **Apostille** only certifies the authenticity of the signature, seal or stamp and the capacity of the person who has signed the attached Singapore public document, and, where appropriate, the identity of the seal or stamp. It does not certify the authenticity of the underlying document.

If this document is to be used in a country not party to the Hague Convention of the 5th of October 1961, it should be presented to the consular section of the mission representing that country.

To verify this **Apostille**, go to

https://legalisation.sal.sg

or scan QR code:



**Verification code: 55144453**

| | |
|---|---|
| 1.  **Country:** | Singapore |
| **This public document** | |
| 2.  **Has been signed by:** | Venkiteswaran Hariharan |
| 3.  **Acting in the capacity of:** | Notary Public |
| 4.  **Bears the seal/stamp of:** | Notary Public |
| **Certified** | |
| 5.  **At:** | Singapore Academy of Law |
| 6.  **The:** | 30th January 2024 |
| 7.  **By:** | Melissa Goh, Director, Trust Services, SAL |
| 8.  **No.:** | AC0O0U0EUE |
| 9.  **Seal/Stamp:** | 10.  **Signature:** |



IN THE COURT OF APPEAL OF THE REPUBLIC OF SINGAPORE

Case No.: CA/CA 10/2023

Doc No.: CA/ORC 5/2024
Filed: 22-January-2024 11:04 AM





Between

GONZALO GIL WHITE
(Mexico Passport No. G25499104)

...Appellant(s)

And

1.   ORO NEGRO DRILLING PTE. LTD.
     (Singapore UEN No. 201225610H)

2.   ORO NEGRO DECUS PTE. LTD.
     (Singapore UEN No. 201320204D)

3.   ORO NEGRO FORTIUS PTE. LTD.
     (Singapore UEN No. 201320197R)

4.   ORO NEGRO IMPETUS PTE. LTD.
     (Singapore UEN No. 201418924G)

5.   ORO NEGRO LAURUS PTE. LTD.
     (Singapore UEN No. 201225628H)

6.   ORO NEGRO PRIMUS PTE. LTD.
     (Singapore UEN No. 201225622D)

...Respondent(s)

In the matter of HC/OS 126/2018

In the matter of Section 39 and 409A of the Companies Act (Cap 50)

And

In the matter of Order 29 Rule 1 of the Rules of Court

Between

1.   ORO NEGRO DRILLING PTE. LTD.
     (Singapore UEN No. 201225610H)

2.   ORO NEGRO DECUS PTE. LTD.
     (Singapore UEN No. 201320204D)

3.   ORO NEGRO FORTIUS PTE. LTD.
     (Singapore UEN No. 201320197R)

4.   ORO NEGRO IMPETUS PTE. LTD.
     (Singapore UEN No. 201418924G)

5.   ORO NEGRO LAURUS PTE. LTD.
     (Singapore UEN No. 201225628H)

6.   ORO NEGRO PRIMUS PTE. LTD.
     (Singapore UEN No. 201225622D)

...Plaintiff(s)

And

1.   INTEGRADORA DE SERVICIOS
     PETROLEROS ORO NEGRO, S.A.P.I. DE C.V.
     (Mexico Registration No. 413253-1)

2.   ALONSO DEL VAL ECHEVERRIA

Certified True Copy

AR Joanne Leong
Supreme Court of Singapore
26 January 2024

(Mexico Passport No. G18367872)

3. GONZALO GIL WHITE
(Mexico Passport No. G03582848)

4. JESUS ANGEL GUERRA MENDEZ
(Mexico Passport No. G29235967)

5. PATRICIO FABIAN HIDALGO ESTRADA
(ID Unknown)

6. OCTAVIO OCHOA HUERTA
(ID Unknown)

7. ELIAS MENDOZA MURGIA
(ID Unknown)

...Defendant(s)

## ORDER OF COURT

| | |
|---|---|
| Case No: | CA/CA 10/2023 |
| Before: | The Honourable Chief Justice Sundaresh Menon, The Honourable Justice Steven Chong and The Honourable Justice Belinda Ang Saw Ean |
| Venue: | in Open Court |
| Hearing date/Time: | 17-January-2024 |

**UPON THE APPEAL** of the abovenamed Appellant in this action coming on for hearing this day and upon hearing counsel for the Appellant and counsel for the 1st to 6th Respondents,

It is ordered that:

1. The appeal against the decision of The Honourable Justice Vinodh Coomaraswamy in HC/ORC 1308/2023 given on 10th March 2023 be dismissed;

2. The costs of the appeal be fixed at S$30,000.00 (inclusive of disbursements) and be paid by the Appellant to the 1st to 6th Respondents forthwith; and

3. The sum of S$20,000.00 held by Messrs Tan Kok Quan Partnership, the solicitors for the Appellant, by way of security for the 1st to 6th Respondents' costs of the appeal pursuant to the Undertaking for Security for Costs dated 4th April 2023, be released to Haridass Ho & Partners, Solicitors for the 1st to 6th Respondents, as part payment of the costs order at paragraph 2 above.

Notes:
1. The person or entity served with this judgment/order and who/which has been ordered to pay money, to do or not to do any act must comply immediately or within the time specified in the judgment/order, if any.
2. Failure to comply may result in enforcement of judgment/order proceedings, including contempt of Court proceedings, against the said person or entity.

Certified True Copy

*Joanne Leong*

AR Joanne Leong
Supreme Court of Singapore
26 January 2024



https://www.courtorders.gov.sg
Access code: 8medbfw4l

Getting this document from the Authentic Court Orders
Portal verifies:
(a) that it was issued by the Courts of the Republic of
Singapore or, in the case of a Schedule of Assets, that it was
filed with the Courts in relation to an application for a Grant
of Probate/Letter of Administration; and (b) the text of the
document was issued on 17 Jan 2024



TAN BOON HENG
REGISTRAR
SUPREME COURT
SINGAPORE



Certified True Copy

AR Joanne Leong
Supreme Court of Singapore
26 January 2024

**IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

Case No.: HC/OS 126/2018

Doc No.: HC/ORC 1308/2023
Filed: 27-March-2023 11:02 AM

In the matter of Section 39 and 409A of the Companies Act (Cap 50)

And

In the matter of Order 29 Rule 1 of the Rules of Court

Between

1.  ORO NEGRO DRILLING PTE. LTD.
    (Singapore UEN No. 201225610H)

2.  ORO NEGRO DECUS PTE. LTD.
    (Singapore UEN No. 201320204D)

3.  ORO NEGRO FORTIUS PTE. LTD.
    (Singapore UEN No. 201320197R)

4.  ORO NEGRO IMPETUS PTE. LTD.
    (Singapore UEN No. 201418924G)

5.  ORO NEGRO LAURUS PTE. LTD.
    (Singapore UEN No. 201225628H)

6.  ORO NEGRO PRIMUS PTE. LTD.
    (Singapore UEN No. 201225622D)

...Plaintiff(s)

And

1.  INTEGRADORA DE SERVICIOS PETROLEROS ORO
    NEGRO, S.A.P.I. DE C.V.
    (Mexico Registration No. 413253-1)

2.  ALONSO DEL VAL ECHEVERRIA
    (Mexico Passport No. G18367872)

3.  GONZALO GIL WHITE
    (Mexico Passport No. G03582848)

4.  JESUS ANGEL GUERRA MENDEZ
    (Mexico Passport No. G29235967)

5.  PATRICIO FABIAN HIDALGO ESTRADA
    (ID Unknown)

6.  OCTAVIO OCHOA HUERTA
    (ID Unknown)

7.  ELIAS MENDOZA MURGIA
    (ID Unknown)

...Defendant(s)



**ORDER OF COURT**

Before:          The Honourable Justice Vinodh Coomaraswamy in Chambers

Date of Order : 10-March-2023

**UPON THE APPLICATION** of the abovenamed Plaintiffs made by way of Originating Summons No. HC/OS 126/2018 in this action coming on for hearing on 6th March 2023 and 10th March 2023, **AND UPON READING** the Affidavit of Noel Blair Hunter Cochrane Jr filed on 26 January 2018, the Affidavits of Vicente Banuelos Rizo filed on 26 January 2018, 26 July 2018 and 11 September 2018, the Affidavits of Alonso Del Val Echeverria filed on 30 May 2018 and 21 August 2018, the Affidavits of Jesus Angel Guerra Mendez filed on 28 June 2018, 23 August 2018 and 12 September 2018, the Affidavit of Carlos David Villasante Santoyo filed on 28 June 2018, the Affidavits of Roger Arnold Hancock filed on 26 July 2018, 19 August 2019, 17 January 2020, 22 April 2021, 30 April 2021 and 19 May 2022, the Affidavit of Thomas Stanley Heather filed on 26 July 2018, the Affidavits of Gonzalo Gil White filed on 28 August 2019, 14 July 2022, 31 October 2022 and 2 March 2023, the Affidavit of Irma Reyes Moran filed on 2 September 2019, the Affidavits of Manuel Ruiz de Chavez Guiterrez de Velasco filed on 17 January 2020 and 16 March 2020, the Affidavit of C Sivah filed on 8 February 2021, the Affidavit of Ragini d/o Parasuram filed on 11 March 2022, the Affidavits of Daniel Alejandro Diaz Alvarez filed on 19 May 2022 and 8 September 2022, the Affidavit of Andrea Dejanira Lopez Ferro filed on 1 November 2022, the Affidavit of Alfonso M. Lopez Melih filed on 10 November 2022 and the exhibits referred to therein and the Plaintiff's Written Submissions filed on 27 February 2023 and the 3rd Defendant's Written Submissions filed on 27 February 2023 **AND UPON HEARING** Counsel for the Plaintiffs and Counsel for the 3rd Defendant,



It is ordered that:

(1) It be and is hereby declared that each of the Resolutions in Writing of Sole Shareholder (as defined in paragraph 2 below) is not sufficient in itself to authorise or empower any director (as defined in paragraph 3 below) of any of the plaintiffs to carry into effect any of the following:

(a) The voluntary cessation of business, dissolution and liquidation of, or any filing for bankruptcy or *concurso mercantile* under the provisions of the Mexican *ley de Concursos Mercantiles* or judicial restructuring by or of any of the plaintiffs;

(b) Any merger, spin-off, transfer, consolidation or corporate restructuring of any of the plaintiffs; and

(c) Any petition in respect of the commencement or agreement by any of the plaintiffs to become a debtor under any bankruptcy, insolvency or similar filing, case or proceeding, including without limitation any filing, case or proceeding seeking liquidation, winding up, reorganisation, arrangement, adjustment, protection, scheme of arrangement, judicial management, relief, composition or a general assignment under any law in any jurisdiction including the filing of a voluntary or a prepackaged *concurso* under the provisions of the Mexican *ley de Concursos Mercantiles*.

The matters set out in paragraphs (a) to (c) above shall be referred to as "Insolvency Matters".

(2) For the purposes of this order, "Resolutions in Writing of Sole Shareholder" means the following resolutions in writing purporting to authorise members of the law firm Guerra Gonzalez y Asociados S.C. ("Guerra") practising law in Mexico to seek a *concurso mercantile on behalf of each of* the plaintiffs, such members including (i) Mr Jesus Angel Guerra Mendez, (ii) Mr Patricio Fabian Hidalgo Estrada, (iii) Mr Octavio Ochoa Huerta and (iv) Mr Elias Mendoza Murgia:

(a) The Resolution in Writing of the Sole Shareholder of the Company passed pursuant to the Articles of Association of the Company dated 20 September 2017 passed by the first

defendant as the sole shareholder of the first plaintiff, ORO NEGRO DRILLING PTE. LTD. (Singapore UEN No. 201225610H).

(b) The Resolution in Writing of the Sole Shareholder of the Company passed pursuant to the Articles of Association of the Company dated 20 September 2017 passed by the first plaintiff as the sole shareholder of the second plaintiff, ORO NEGRO DECUS PTE. LTD. (Singapore UEN No. 201320204D).

(c) The Resolution in Writing of the Sole Shareholder of the Company passed pursuant to the Articles of Association of the Company dated 20 September 2017 passed by the first plaintiff as the sole shareholder of the third plaintiff, ORO NEGRO FORTIUS PTE. LTD. (Singapore UEN No. 201320197R).

(d) The Resolution in Writing of the Sole Shareholder of the Company passed pursuant to the Articles of Association of the Company dated 20 September 2017 passed by the first plaintiff as the sole shareholder of the fourth plaintiff, ORO NEGRO IMPETUS PTE. LTD. (Singapore UEN No. 201418924G).



(e) The Resolution in Writing of the Sole Shareholder of the Company passed pursuant to the Articles of Association of the Company dated 20 September 2017 passed by the first plaintiff as the sole shareholder of the fifth plaintiff, ORO NEGRO LAURUS PTE. LTD. (Singapore UEN No. 201225628H).

(f) The Resolution in Writing of the Sole Shareholder of the Company passed pursuant to the Articles of Association of the Company dated 20 September 2017 passed by the first plaintiff as the sole shareholder of the sixth plaintiff, ORO NEGRO PRIMUS PTE. LTD. (Singapore UEN No. 201225622D).

(3) For the purposes of this order, "director" includes:

(a) any person occupying the position of a director of any of the plaintiffs, by whatever name called;

(b) a person in accordance with whose directions or instructions the directors or the majority of the directors of any of the plaintiffs are accustomed to act; and

(c) an alternate or substitute director of any of the plaintiffs.

(4) It be and is hereby declared that the only directors of the first plaintiff as at 10 March 2023 are as follows:

(a) Noel Blair Hunter Cochrane Jr with effect from 29 September 2016;

(b) Roger Arnold Hancock with effect from 25 September 2017; and

(c)Roger Alan Bartlett with effect from 25 September 2017.

(5) It be and is hereby declared that the only directors of each of the second to sixth plaintiffs as at 10 March 2023 are as follows:

(a) Noel Blair Hunter Cochrane Jr with effect from 29 September 2016;

(b) Roger Arnold Hancock with effect from 25 September 2017;

(c) Roger Alan Bartlett with effect from 25 September 2017; and

(d) Lambertus Hendrik Veldhuizen with effect from 16 May 2022.

(6) It be and is hereby declared that each of the first defendant and the third defendant, whether by themselves, their servants or agents or howsoever and whether by way of the Resolutions in Writing of Sole Shareholder of the Company or otherwise, does not have

the authority of or a power conferred by any of the plaintiffs to cause or attempt to cause any of the plaintiffs to do any of the following:

(a) to commence, continue or maintain any Insolvency Matter in Mexico or elsewhere, purportedly on behalf of any the plaintiffs; or

(b) to instruct legal representatives in Mexico or elsewhere to commence, continue or maintain any Insolvency Matter in Mexico or elsewhere purportedly on behalf of any of the plaintiffs.

(7) The first defendant be and is hereby enjoined, whether by itself, by its servants or agents or howsoever and whether by reliance on the Resolutions in Writing of Sole Shareholder of the Company or otherwise, from:

(a) commencing, continuing or maintaining any Insolvency Matter in Mexico or elsewhere, purportedly on behalf of any of the plaintiffs; or

(b) instructing legal representatives in Mexico or elsewhere to commence, continue or maintain any Insolvency Matter in Mexico or elsewhere purportedly on behalf of any of the plaintiffs.



(8) The third defendant be and is hereby enjoined, whether by himself, by his servants or agents or howsoever and whether by reliance on the Resolutions in Writing of Sole Shareholder of the Company or otherwise, from:

(a) commencing, continuing or maintaining any Insolvency Matter in Mexico or elsewhere, purportedly on behalf of any of the plaintiffs; or

(b) instructing legal representatives in Mexico or elsewhere to commence, continue or maintain any Insolvency Matter in Mexico or elsewhere purportedly on behalf of any of the plaintiffs.

(9) The third defendant shall pay to each of the plaintiffs damages, such damages to be assessed, for his breach of the implied contract between himself and each of the plaintiffs which incorporates as a term the substance of Article 115A of the first, fifth and sixth plaintiffs' Articles of Association and of Article 111A of the second, third and fourth plaintiffs' Articles of Association.

(10) The first defendant shall pay to each of the plaintiffs damages, such damages to be assessed, for inducing the third defendant to breach his implied contract with each of the plaintiffs under paragraph 9 above.

(11) The first defendant and the third defendant shall pay to the plaintiffs a single set of their costs of and incidental to this application, such costs fixed at $25,000 including disbursements.

TAN BOON HENG
REGISTRAR
SUPREME COURT



*https://www.courtorders.gov.sg*
*Access code: 8hf73ubr0*

Getting this document from the Authentic Court Orders
Portal verifies:
(a) that it was issued by the Courts of the Republic of
Singapore or, in the case of a Schedule of Assets, that it was
filed with the Courts in relation to an application for a Grant
of Probate/Letter of Administration; and (b) the text of the
document was issued on 10 Mar 2023



SINGAPORE

